703 F.2d 586
 227 U.S.App.D.C. 19
 The COMMUNITY FOR CREATIVE NON-VIOLENCE, et al., Appellants,
v.
James G. WATT, Secretary of the Interior, et al.
The COMMUNITY FOR CREATIVE NON-VIOLENCE, et al., Appellants,
v.
James G. WATT, Secretary of the Interior, et al.
 Nos. 82-2445, 82-2477.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 14, 1983.
Decided March 9, 1983.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Action No. 82-02501).
 Burt Neuborne, New York City, of the bar of the State of N.Y., by special leave of Court, pro hac vice, with whom were associated Arlene S. Kanter, Laura Macklin, Arthur B. Spitzer and Elizabeth Symonds, Washington, D.C., argued the case on behalf of appellants.
 John D. Bates, Asst. U.S. Atty., with whom were associated Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., argued the case on behalf of appellees.
 Before ROBINSON, Chief Judge, WRIGHT, TAMM, MacKINNON, WILKEY, WALD, MIKVA, EDWARDS, GINSBURG, BORK and SCALIA, Circuit Judges.
 ON REHEARING EN BANC
 PER CURIAM:
 
 
 1
 Circuit Judge Mikva files an opinion, in which Circuit Judge Wald concurs, in support of a judgment reversing. Chief Judge Robinson and Circuit Judge Wright file a statement joining in the judgment and concurring in Circuit Judge Mikva's opinion with a caveat. Circuit Judge Edwards files an opinion joining in the judgment and concurring partially in Circuit Judge Mikva's opinion. Circuit Judge Ginsburg files an opinion joining in the judgment. Circuit Judge Wilkey files a dissenting opinion, in which Circuit Judges Tamm, MacKinnon, Bork and Scalia concur. Circuit Judge Scalia files a dissenting opinion, in which Circuit Judges MacKinnon and Bork concur. The judgment appealed from is reversed, and the case is remanded to the District Court with instructions to enjoin appellees from prohibiting sleeping by demonstrators in tents on sites authorized for appellants' demonstration.
 
 MIKVA, Circuit Judge:
 
 2
 The Community for Creative Non-Violence (CCNV) applied for and was granted a renewable seven-day permit to conduct a round-the-clock demonstration, commencing on the first day of winter, on the Mall and in Lafayette Park in Washington, D.C. The declared purpose of the demonstration was to impress upon the Reagan Administration, the Congress, and the public the plight of the poor and the homeless. The National Park Service (Park Service) granted CCNV a permit to set up two symbolic campsites, one on the Mall with a maximum of one hundred participants and forty tents, and one in Lafayette Park with approximately fifty participants and twenty tents.
 
 
 3
 Although the permit allowed the demonstration participants to maintain a twenty-four hour presence at their symbolic campsites, the Park Service denied the participants a permit to sleep. According to the government, such conduct would violate the Park Service's recently revised anti-camping regulations, see 36 C.F.R. Secs. 50.19, 50.27 (1982). CCNV claims that this prohibition strikes at the core message the demonstrators wish to convey--that homeless people have no permanent place to sleep. Accordingly, CCNV and seven individuals who wish to participate in the demonstration seek a court order invalidating the permit's limitation on sleeping as an unconstitutional restriction on their freedom of expression. Following cross-motions for summary judgment, the district court decided in favor of the Park Service and the case arose on expedited appeal. After briefing and oral argument before a motions panel, but before that panel issued a decision, the case was heard en banc.
 
 
 4
 Because we conclude that the government has failed to show how the prohibition of sleep, in the context of round-the-clock demonstrations for which permits have already been granted, furthers any of its legitimate interests, we reverse the district court's decision and grant CCNV's request for injunctive relief.
 
 I. BACKGROUND
 A. The Regulatory Framework
 
 5
 This case presents the second occasion in which the government has sought to apply anti-camping regulations to demonstrations proposed by this appellant. In 1981, the Park Service allowed CCNV to erect nine tents in Lafayette Park to symbolize the desperation of homeless persons, but denied the demonstrators permission to dramatize this concern by actually sleeping in the tents. Under the regulations then in effect, 36 C.F.R. Sec. 50.19(e)(8) (1981) (use of temporary structures); id. Sec. 50.27(a) (camping), the Park Service reasoned that overnight sleeping would carry the demonstration beyond the permissible "use of symbolic campsites reasonably related to First Amendment activit[y]" and into the impermissible realm of "camping primarily for living accommodation," see 46 Fed.Reg. 55,961 (1981). CCNV appealed that ruling.
 
 
 6
 In Community for Creative Non-Violence v. Watt (CCNV I), 670 F.2d 1213 (D.C.Cir.1982), this court held that the Park Service had misapplied those regulations to CCNV's proposed activity. Because the regulations precluded only camping "primarily for living accommodation," and the act of sleeping in CCNV's demonstration was not to be done for that purpose, the court found that such conduct fell outside of the Park Service's proscription:[T]here is no evidence in the Record suggesting that the handful of tents in Lafayette Park is intended "primarily for living accommodation." The appellees will not prepare or serve food there; they will not build fires or break ground; they will not establish sanitary or medical facilities. Indeed the uncontroverted evidence in the case is that the purpose of the symbolic campsite in Lafayette Park is "primarily" to express the protestors' message and not to serve as a temporary solution to the problems of homeless persons. Thus the only activity at issue here--sleeping in already erected symbolic tents--cannot be considered "camping" ....
 
 
 7
 Id. at 1217. As a result of the court's decision, CCNV staged its demonstration, including sleeping, for approximately seven weeks last winter.
 
 
 8
 The Park Service has since revised its camping regulations for the National Capital Region through a formal rulemaking. 47 Fed.Reg. 24,299-306 (1982) (codified at 36 C.F.R. Secs. 50.19, 50.27 (1982)). The new regulations, set out in the margin,[1] specifically include within the definition of prohibited camping the act of sleeping "when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging." 47 Fed.Reg. at 24,30 2. Although the amended regulation admittedly permits some leeway for administrative discretion, the Park Service has determined that the regulation prohibits the sleeping that would be done at CCNV's demonstration this winter.
 
 
 9
 To understand fully the government's current policy on sleeping in the capital's parks, it is important to note that sleeping is not, per se, illegal. Visitors to the capital, or workers on their lunch breaks, may safely catnap for short periods of time without running afoul of the law. Sleeping, in these circumstances, conjures up no threats to peace and public order. Although the Park Service's anti-loitering regulation prohibits sleeping with intent to remain for more than four hours, it contains an exception for those with the proper authorization of the Superintendent of the National Capital Parks. See 36 C.F.R. Sec. 50.25(k) (1982). And, as mentioned, the government's camping regulation also allows for "sleeping activities" that are not deemed to constitute use of the area for living accommodation. An example of the discretion inherent in this latter determination is evidenced by the Park Service's authorization, for participants in a Vietnam veterans' demonstration on the Mall in May 1982,[2] of all-night sleep at a mock Vietnam War-era "firebase" where some of the demonstrators were periodically roused to stand symbolic "guard duty."[3] See Park Service Permit to Vietnam Veterans Against the War dated April 20, 1982 and accompanying letter, reprinted in Record Document (RD) 5. The only apparent distinction between the sleeping in the veterans' demonstration and the sleeping proposed by CCNV is that the veterans slept on the ground, without any shelter. According to the Park Service's interpretation of the new regulations, one's participation in a demonstration as a sleeper becomes impermissible "camping" when it is done within any temporary structure erected as part of the demonstration.
 
 
 10
 The Park Service nonetheless allows the erection of temporary structures, including tents, in connection with permitted demonstrations under 36 C.F.R. Sec. 50.19(e)(8) (1982).[4] Originally worded to allow any "temporary structures ... reasonably necessary for the conduct of the demonstration," 41 Fed.Reg. 12,879, 12,883 (1976), this regulation was amended in 1982 to state specifically that temporary structures "may be erected for the purpose of symbolizing a message," 47 Fed.Reg. at 24,305. Since that amendment, the Park Service has, on at least two occasions besides this one, granted permits to groups of demonstrators to erect symbolic tents. See Park Service Permit to ACORN dated June 18, 1982, reprinted in RD 5 (50 tents dramatizing housing crisis); Park Service Permit to Palestine Congress of North America dated September 8, 1982, reprinted in RD 5 (107 tents symbolizing Palestinian refugee camp). Tents were also allowed prior to the amendment to symbolize conditions in Vietnam, the plight of American Indians, and the plight of the homeless. 47 Fed.Reg. at 24,301.
 
 B. The Case Law
 
 11
 The dispute in this case over the Park Service's camping regulations bears similarities to numerous other disputes that this court has heard within the last fifteen years, each concerning the proper use of public park lands within the nation's capital. E.g., CCNV I, 670 F.2d 1213 (D.C.Cir.1982) (sleeping in Lafayette Park); United States v. Abney, 534 F.2d 984 (D.C.Cir.1976) (sleeping in Lafayette Park); Vietnam Veterans Against the War v. Morton (VVAW), 506 F.2d 53 (D.C.Cir.1974) (camping on Mall); A Quaker Action Group v. Morton (Quaker Action), No. 71-1276 (D.C.Cir. Apr. 19, 1971), vacated mem., 402 U.S. 926, 91 S.Ct. 1398, 28 L.Ed.2d 665 (1971) (camping on Mall); see also O'Hair v. Andrus, 613 F.2d 931 (D.C.Cir.1979) (papal mass on Mall); A Quaker Action Group v. Morton, 516 F.2d 717 (D.C.Cir.1975) (public gathering in Lafayette Park); Women Strike for Peace v. Morton, 472 F.2d 1273 (D.C.Cir.1972) (display on Ellipse); Jeannette Rankin Brigade v. Chief of Capitol Police, 421 F.2d 1090 (D.C.Cir.1969) (assembly on Capitol grounds). It should not be surprising, therefore, to learn that from this considerable history of decisionmaking the court has on several occasions addressed the propriety vel non of sleeping, in connection with public demonstrations, on the Mall and in Lafayette Park.
 
 
 12
 In 1971, in Quaker Action, No. 71-1276 (D.C.Cir. Apr. 19, 1971), this court modified a district court order limiting an anti-war demonstration on the Mall to the hours of 9:00 am to 4:30 pm. As a matter of summary reversal, the court lifted the district court's nighttime curfew and allowed the demonstrators to use a section of the Mall "as part of their public demonstrations ... for the purpose of sleeping in their own equipment, such as sleeping bags ...." Id., cited in VVAW, 506 F.2d at 56 n. 9. The Supreme Court vacated our summary reversal in that case by a decree without opinion in Morton v. Quaker Action Group, 402 U.S. 926, 91 S.Ct. 1398, 28 L.Ed.2d 665 (1971), an action which a motions panel of this court recognized as controlling in a dispute between the same litigants and involving similar sleeping on the Mall three years later. See VVAW, 506 F.2d at 56. Despite the very specific nature of its holding, the VVAW panel expressed its view that camping overnight is an activity "whose unfettered exercise is not crucial to the survival of democracy and ... thus beyond the pale of First Amendment protection." Id. at 57-58. In United States v. Abney, 534 F.2d 984 (D.C.Cir.1976), this court characterized the gratuitous statements in VVAW as non-binding dicta[5] and held that, in the unusual circumstances of an individual protestor's round-the-clock vigil in Lafayette Park, unavoidable sleeping "must be taken to be sufficiently expressive in nature to implicate First Amendment scrutiny in the first instance." Id. at 985. The Abney court then held the Park Service's anti-loitering regulation unconstitutional as applied, but stated in dicta that, "[i]t may well be that [a non-discretionary] across-the-board ban on sleeping outside official campgrounds would be constitutionally acceptable if duly promulgated and even-handedly enforced." Id. at 986.
 
 
 13
 The question left open by Abney was not squarely before us last term in CCNV I; the Park Service's anti-camping regulation was construed to avoid the constitutional issue. As part of the court's decision, however, it was necessary to categorize the sleeping activities of the protestors as falling within one of two administrative classifications: (1) the use of symbolic campsites reasonably related to first amendment activities or (2) camping primarily for living accommodations. The CCNV I court concluded:
 
 
 14
 We have no doubt as to which category encompasses the activities in question here. First, the appellees are engaged in a political protest and a petition for redress of grievances. As part of their protest, the appellees desire permission to sleep in their tents in Lafayette Park. This appears to be no more than "the use of [a] symbolic campsite[ ]." Moreover, as the District Court found, in this case sleeping itself may express the message that these persons are homeless and so have nowhere else to go.
 
 
 15
 670 F.2d at 1216-17 (footnote omitted) (emphasis in original). When the CCNV I decision is added to the decisions of this court in Abney and Quaker Action, it is quite clear that on several occasions this court has acknowledged that sleep can be "expressive," or part of a political protest, for the purposes of either administrative or constitutional classifications.
 
 II. DISCUSSION
 
 16
 The district court's decision in this case necessarily followed from its conclusions that: (1) CCNV's demonstration falls within the scope of the amended anti-camping regulations; (2) sleeping, within the context of CCNV's demonstration, falls outside the scope of the first amendment; and (3) even assuming first amendment scrutiny is required, the new anti-camping regulations are constitutional as applied to CCNV's proposed sleeping activities. Although we agree that CCNV's proposed activities fall within the government's amended regulations, we cannot uphold the constitutionality of the regulations as applied to CCNV.
 
 A. The Scope of the New Regulations
 
 17
 CCNV contends that it does not fall under the amended anti-camping regulations because it seeks to use sleep as a form of expression and not for "living accommodation" purposes. We cannot accept this argument. The regulation's exclusion of "the intent of the participants or the nature of any other activities in which they may also be engaging," 36 C.F.R. Secs. 50.19(e)(8), 50.27(a) (1982), underscores the evident purpose of the regulations to cover "living accommodations" that may also be expressive of the demonstrators' message. Indeed, in the prefatory statement accompanying the 1982 amendments, the Park Service indicated that it was "amending Sec. 50.19(e)(8) to forbid specifically the use of any such structures, including tents, for the purpose of conducting any living accommodation activity," which was defined to include "sleeping." 47 Fed.Reg. at 24,304 (emphasis added). As we stated in CCNV I, the court may rely upon an agency's contemporaneously issued policy statement as an accurate representation of the agency's purpose. 670 F.2d at 1216 (citing Environmental Defense Fund, Inc. v. EPA, 636 F.2d 1267, 1280 (D.C.Cir.1980)). It thus seems clear to us that these demonstrators come under the new regulations.[6]
 
 B. The Scope of the First Amendment
 
 18
 The scope of the first amendment's protection of free expression is not as amenable to precise definition as the Park Service's prohibition of "camping." The Supreme Court has afforded first amendment scrutiny to government regulation of such expressive activities as demonstrating,[7] marching,[8] leafletting,[9] picketing,[10] wearing armbands,[11] and affixing a peace symbol to an American flag.[12] Although we acknowledge that all conduct need not be labelled "speech" merely because the doer "intends thereby to express an idea," United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968), we also recognize that expressive conduct cannot be written out of the Constitution merely because the government may wish to label it "camping." The values implicit in the first amendment are too multifaceted to be subject to wooden categorizations.[13]
 
 
 19
 In the present case, our evaluation of the government's ban on sleeping in symbolic structures is underscored by first amendment scrutiny because, as applied to CCNV's proposed demonstration, the government's ban will clearly affect expression: there can be no doubt that the sleeping proposed by CCNV is carefully designed to, and in fact will, express the demonstrators' message that homeless persons have nowhere else to go. The "test" used by the Supreme Court to determine whether conduct is "sufficiently imbued with elements of communication to fall within the scope of the First ... Amendment[ ]," Spence v. Washington, 418 U.S. 405, 409, 94 S.Ct. 2727, 2729, 41 L.Ed.2d 842 (1974) (per curiam), is to examine the intent of the would-be communicator and the context in which his or her conduct takes place. In Spence, for example, the Court held that displaying the American flag with an attached peace symbol in the context of demonstrations against the bombings of Cambodia and the Kent State killings:
 
 
 20
 was not an act of mindless nihilism. Rather, it was a pointed expression of anguish by appellant about the then-current domestic and foreign affairs of his government. An intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.
 
 
 21
 Id. at 410-11, 94 S.Ct. at 2730-2731 (emphasis added). This court has already held that, within the context of an individual's round-the-clock vigil, sleeping could be taken as "sufficiently expressive in nature to implicate First Amendment scrutiny in the first instance." Abney, 534 F.2d at 985. In the present case, within the context of a large demonstration with tents, placards,[14] and verbal explanations,[15] the communicative context is sufficiently clear that the participant's sleeping cannot be arbitrarily ruled out of the arena of expressive conduct.[16]
 
 
 22
 Indeed, we cannot understand how the government can deny the indicia of political expression that permeate CCNV's pointed use of the simple act of sleeping. The protestors choose to sleep, purposely across from the White House and Capitol grounds, in sparsely appointed tents which the Park Service has already designated as undeniably "symbolic." Their permit application states that this conduct is intended to send the same message as this court recognized was sent in CCNV's 1981-82 demonstration: that the problems of the homeless will not simply disappear into the night.[17] Unlike the thousands of homeless men and women whose nights are spent on grates, in doorways, or in back alleys, these demonstrators propose to sleep within the conspicuous context of two organized demonstration sites that create a backdrop--by the combined use of structures, explanatory signs, and verbal discourse--to ensure that the message sought to be sent by the demonstrators' conduct will, in all likelihood, be received. True, CCNV has devised a means of expression that also serves to provide the protestors with the "luxury" of a blanket and a bit of groundspace, within a tent, with which to pass a winter's night. But for those genuinely homeless persons who choose to forsake temporarily their grates and doorways for these tents, the communicative dimension of the sleeping in this demonstration is not overshadowed by the simultaneous provision of a single amenity. The first amendment is not so rarefied that it cannot accommodate within its scope the conduct of these demonstrators who use their bodies to express the poignancy of their plight.
 
 
 23
 We add, moreover, that even were we not to focus on the peculiarly expressive nature of sleeping, first amendment scrutiny would still be implicated. This conclusion stems from the fact that the protestors' purpose, whether asleep or awake, is to maintain a "symbolic presence that makes more visible and concrete the results of [presidential and congressional] inaction" on the conditions of the homeless. See CCNV application to demonstrate filed September 7, 1982, reprinted in RD 1, at 2. In short, the demonstrators seek to create an inescapable night-and-day reminder to the nation's political leadership that homeless persons exist. Given this undeniable intent, and the contextual fact that the demonstration will take place at the seat of our national government, it is clear that CCNV's proposed "presence" is intended to be expressive regardless of whether the demonstrators sit down, lie down, or even sleep during the course of the demonstration. Thus, whatever the particular form of the protestors' presence at night, their presence itself implicates the first amendment. In this respect, CCNV's twenty-four hour presence is entitled to the same first amendment protection as a vigil. Although not as small, stylized, or silent as the "reproachful presence" in Brown v. Louisiana, 383 U.S. 131, 142, 86 S.Ct. 719, 724, 15 L.Ed.2d 637 (1965) (silent civil rights vigil in a segregated public library), it is identical in both concept and purpose to such conduct. See United States v. Abney, 534 F.2d 984 (D.C.Cir.1976) (sleeping as part of a vigil in Lafayette Square entitled to first amendment scrutiny in the first instance).
 
 
 24
 We wish to make clear, however, that by holding sleeping to be expressive conduct within the context of this particular demonstration, we reject two subsidiary arguments urged on us by CCNV. First, we reject CCNV's contention that sleeping in its demonstration is uniquely deserving of first amendment protection because it directly embodies the group's message that homeless people have no place else to sleep.[18] Under CCNV's distinction, a group with a "no-place-to-sleep" message (such as the homelessness of refugees) could express it by deliberately sleeping, but a group with a different message (such as opposition to the nuclear arms race) could not sleep. Such a distinction is impermissible, however, because it would require the government to draw distinctions among groups desiring to express themselves through sleeping depending on the subject matter or content of their message and its alleged relationship to sleep, something the first amendment is designed to prevent. See, e.g., Consolidated Edison Co. v. Public Service Commission, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980); L. TRIBE, AMERICAN CONSTITUTIONAL LAW Sec. 12-2, at 580 (1978). Second, we also reject CCNV's argument that its sleeping must be protected because it is the most effective means by which the group can convey its message.[19] The first amendment does not guarantee individuals access to the most effective channels of communication. See, e.g., Adderley v. Florida, 385 U.S. 39, 47-48, 87 S.Ct. 242, 247-248, 17 L.Ed.2d 149 (1966). On the other hand, the fact that CCNV's manner of expression may turn out to be quite effective does not make it any the less "speech."[20]
 
 C. The Regulation as Applied
 
 25
 That CCNV's conduct comes within the scope of the first amendment, however, only begins our constitutional analysis. In United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court noted that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." Id. at 376, 88 S.Ct. at 1678. The O'Brien Court then established that a governmental interest may be sufficiently justified
 
 
 26
 if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
 
 
 27
 Id. at 377, 88 S.Ct. at 1679. In short, O'Brien requires us to engage in a balancing of first amendment freedoms and their societal costs[21] that is structured to place a thumb on the first amendment side of the scales.[22]
 
 
 28
 In approaching this task, we are mindful that CCNV seeks a permit for the exercise of first amendment rights on public parkland whose use for communication is of special importance:
 
 
 29
 There is an unmistakable symbolic significance in demonstrating close to the White House or on the Capitol grounds which, while not easily quantifiable, is of undoubted importance in the constitutional balance. Although this theory has been used to justify demonstrations near state capitols as well, see Edwards v. South Carolina, 372 U.S. 229 [83 S.Ct. 680, 9 L.Ed.2d 697] (1963), it is in Washington--where a petition for redress of national grievances must literally be brought--that the theory has its primary application.
 
 
 30
 Women Strike for Peace v. Morton, 472 F.2d 1273, 1287 (D.C.Cir.1972) (Wright, J., concurring). As the Supreme Court added in Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972), "[t]he right to use a public place for expressive activity may be restricted only for weighty reasons."
 
 
 31
 The Park Service argues that its prohibition of CCNV's sleeping in the symbolic tents is justified because such activity could: (1) deprive others of the use of nationally significant space; (2) cause significant damage to park resources; (3) create serious sanitation problems; (4) seriously tax law enforcement resources; and (5) increase requests for such activity in connection with other demonstrations that would, in turn, create pressure from nondemonstrating visitors for similar accommodations. 47 Fed.Reg. 24,302 (1982). These interests are identified by the Park Service in its brief in this case[23] and were also identified in its 1982 rulemaking to justify the flat prohibition of "camping." Id. "Camping," however, includes such non-sleeping activities as making fires, digging, earth breaking, and cooking. Id. at 24,305. Because CCNV neither seeks to do any of these activities, nor requests permission to establish medical or sanitation facilities,[24] to store personal belongings,[25] or even to serve food,[26] the government's interests must be weighed against only that activity which CCNV seeks to do: sleep within tents that they have been given permission to erect[27] and at which they have been allowed to maintain a twenty-four hour presence.
 
 
 32
 This is not to say, however, that the government's interest in prohibiting expressive sleeping at symbolic campsites that is part of a demonstration must be weighed in a vacuum. In Heffron v. International Society for Krishna Consciousness, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), the Supreme Court held that the government's interest in prohibiting first amendment activity must be assessed not in terms of letting just one group pursue the activity but in terms of letting all similarly situated groups do so. Id. at 654, 101 S.Ct. at 2567. Transposed to the first amendment activity involved in this case, therefore, Heffron requires us to determine if the government's interests in park preservation, law enforcement, and the like (outlined above) are furthered by prohibiting expressive sleeping by all individuals or groups similarly situated to CCNV--that is, by all those who wish to engage in sleeping as part of their demonstration and have been granted renewable permits to demonstrate on a twenty-four hour basis on sites at which they have also been allowed to erect temporary symbolic structures. The dissent insists that we weigh the government's interests in prohibiting sleeping by all groups--whether for first amendment purposes or not--lest we "nickle and dime every regulation to death." Dissenting Opinion at 616. The dissent's addition of makeweights to the government's side of the balance, however, shortchanges the first amendment's premium on precision. Here, the Park Service has already established a renewable permit procedure that limits the number of people who are allowed to demonstrate or to erect symbolic structures. The interests of people who do not possess a permit are simply not at issue in this case.
 
 
 33
 Having properly focused the inquiry, it is difficult to imagine how the application of the Park Service's regulations to groups similarly situated to CCNV will further any important interest. Because such groups are already allowed to erect tents and maintain an all-night presence during which time they may sit, stand, or even lie down in the tents, there are no incremental savings of park resources, sanitation facilities, or law enforcement personnel to be gained by proscribing only sleep. Indeed, allowing an all-night presence by wakeful protestors would seem to tax sanitation facilities, law enforcement personnel, and the park resource itself to a greater extent than would allowing those same protestors simply to sleep.
 
 
 34
 Our review of the prefatory rationale to the revised regulations reveals at most only one attenuated governmental interest in precluding CCNV's demonstrators from sleeping:
 
 
 35
 Experience with administering the court's decision allowing sleeping has revealed that sleeping activity by demonstrators expands to include other aspects of living accommodations such as the storage of personal belongings and the performance of necessary functions which have converted the sleeping area into actual campsites.
 
 
 36
 47 Fed.Reg. at 24,301. But this justification must be found wanting under O'Brien 's "no greater [restriction] than is essential" test; any interest in preventing other "camping" activity can be furthered by less restrictive means.[28] Here, the Park Service's renewable permit procedure provides a mechanism whereby permits can be revoked if illegal activities occur. See 36 C.F.R. Sec. 50.19(f) (1982).[29]
 
 
 37
 The government's interest in preserving parkland for the use of others is also not furthered by its ban on sleep. If anything, the nighttime enjoyment of Lafayette Park and the Mall by nondemonstrators would probably be enhanced if the 150 CCNV demonstrators were asleep. Because CCNV has already been granted a renewable seven-day, twenty-four hour permit to demonstrate at its two discrete sites, a ban on sleeping simply does not preserve those parts of the parks for the use of others. To the extent that other demonstrators wish to use the space temporarily allocated to CCNV, the Park Service's permit procedures already provide for nonrenewal of CCNV's weekly permit. See id. Sec. 50.19(e)(5).
 
 
 38
 We are next urged to consider the government's interest in preventing "pressure" for similar living accommodations from nondemonstrating visitors to Washington, D.C. 47 Fed.Reg. at 24,302. As a practical matter, we seriously question whether there is a large market for living accommodations in sparse tents on the Mall, in the winter, without heating, cooking, medical, or sanitation facilities. Even assuming that such a market is theoretically possible, we note that such an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Tinker v. Des Moines School District, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969).[30] As a constitutional matter, moreover, the Park Service is free to apply its anti-camping regulations to such nondemonstrators who, by definition, have no first amendment interests to "balance" against the regulation. We add that any governmental interest in not treating certain groups--even those exercising first amendment rights--differently from others would appear to be marginally insignificant. Demonstrators are already accorded privileges not permitted nondemonstrators, such as the right to stay in the park all night despite the anti-loitering regulation, 36 C.F.R. Sec. 50.25(k) (1982), and the right to erect temporary structures, id. Sec. 50.19(e)(8). The additional privilege of sleeping at the demonstration site as part of the demonstration would seem of minimal consequence to the distinctions on treatment already drawn.
 
 
 39
 Finally, the government suggests that requests for convenient camping by persons pursuing speech activities would increase. If by this the government means that additional camping requests will be made by those who merely wish to sleep in parks near the sites of daytime demonstrations, such requests may be denied. It would seem an entirely permissible distinction to permit sleeping that is expressive as part of a twenty-four hour vigil, but not to permit sleeping that is a mere convenience to daytime demonstrators. See Quaker Action Group v. Morton, 402 U.S. 926, 91 S.Ct. 1398, 28 L.Ed.2d 665 (1971); VVAW, 506 F.2d 53 (D.C.Cir.1974).[31] If, on the other hand, the government anticipates an increase in applications for symbolic campsites, with requests for permission to sleep during all night demonstrations, it may not deny all such requests merely because it expects a large number of people to apply.
 
 
 40
 Our holding does not mean, however, that the Park Service must grant every request, at any time, for any number of temporary structures or sleepers. Merely because we have held that expressive sleep may not be prohibited on the basis of the message conveyed does not mean that all forms of regulation are foreclosed to the government.[32] Thus, the government may use valid, content-neutral, time, place, or manner regulations provided that such regulations are both reasonable and narrowly tailored to further the government's substantial interests. See Police Department of Chicago v. Mosley, 408 U.S. 92, 101 n. 8, 92 S.Ct. 2286, 2293 n. 8, 33 L.Ed.2d 212 (1972); Grayned, 408 U.S. at 115, 92 S.Ct. at 2302. The government may, for example, limit the number of tents, the size of tents or campsites,[33] and the number of persons allowed to sleep.[34] It may continue its current practice of issuing permits on a renewable weekly basis, under which one group's permit will not be renewed if another group requests the space, and under which the permit may be revoked if the demonstrators engage in such prohibited activities as cooking or making fires. It may set aside certain times when no demonstrations are allowed in order to accommodate other particularly heavy uses of the parks. See 36 C.F.R. Sec. 50.19(d)(1), (e)(8) (1982). And possibly, it may be able to set aside some of the more serene areas of the Memorial Core area as "sanctuaries" at which round-the-clock demonstrations are never compatible.[35]
 
 
 41
 In sum, the Park Service has failed to demonstrate that the government's interests will be furthered by keeping these putative protestors from the sleeping activity which is the sole point in dispute. We reverse, therefore, because the indiscriminate line the government seeks to draw against sleeping cannot pass first amendment muster. Accordingly, we grant CCNV the injunctive relief it seeks, enjoining the Park Service from prohibiting sleep at CCNV's demonstration.
 
 CONCLUSION
 
 42
 The Mall and Lafayette Park are special places in the stockpile of American fora. They are at the very heart of the nation's capital where ideas are to be expressed and grievances are to be redressed. Thus, the focus of this case is the symbolic locus of the first amendment. This explains the series of understandable difficulties that the Park Service has had in trying to fashion rules that meet the multifarious demands put upon these unique public lands. It also rationalizes the number of times that this court has visited the problems of the Mall, Lafayette Park, and the first amendment.
 
 
 43
 But the uniqueness does not justify an abandonment of either first amendment principles or legitimate government interests in managing these public places. Considering these two imperatives, we reach several conclusions.
 
 
 44
 First, the Park Service regulations are facially valid and can be employed in the management of the Mall and Lafayette Park.
 
 
 45
 Second, the application of these regulations to specific fact situations implicating the first amendment must be measured against the government's interest in limiting certain activities and the means it employs to further those interests. It is in this respect that the Park Service cannot be upheld in its decision that tenting is all right, lying down is all right, maintaining a twenty-four hour presence is all right, but sleeping is impermissible.
 
 
 46
 Finally, the Park Service cannot mechanically apply its regulations to requests from groups seeking to exercise first amendment rights through sleeping. Although the government can and must retain a "content-neutral" obliviousness to the kind of message which a particular group seeks to express through sleeping, the Park Service cannot be oblivious to the implications of the first amendment--or the attendant complications. Each distinction and each line the Park Service draws in such applications must bear close scrutiny to ensure that symmetry of management does not crowd out first amendment claims.
 
 
 47
 We doubt that this will be the last occasion that this court will have to undertake the difficult reconciliation of first amendment activities with the necessity for order and management in the Mall and Lafayette Park. In a pluralistic society boasting of its free expression, we can expect no less.[36]
 
 
 48
 It is so ordered.
 
 
 49
 SPOTTSWOOD W. ROBINSON, III, Chief Judge, and J. SKELLY WRIGHT, Circuit Judge, concurring:
 
 
 50
 We join in reversal, and in Judge Mikva's opinion with a caveat to one branch of its First Amendment analysis. As the opinion explains convincingly, sleeping in tents at the demonstration sites is a vivid and forceful component of the public message the demonstrators seek to convey; it summons First Amendment scrutiny because, qua sleeping, it is expressive. We intimate no view as to whether sleeping would implicate the First Amendment were it not to add its own communicative value to the demonstration.
 
 HARRY T. EDWARDS, Circuit Judge, concurring:
 
 51
 For the reasons set forth below, I would reverse the judgment of the District Court. In some significant respects, I concur in Judge Mikva's opinion. I write separately, however, because I view the case from a somewhat narrower perspective than does he.
 
 I.
 
 52
 I find this case to be both difficult and confounding in several respects. First, it is not entirely clear to me why the appellants have pursued this litigation. While I am not prepared to say that this suit was ill-advised, I remain troubled by certain theoretical inconsistencies in the appellants' presentations to this court, the trial court, and in their application to the National Park Service. It would seem to me that when one pursues a claim involving important constitutional rights in areas affected by amorphous legal doctrine, the litigation should be founded on some clear, consistent, and tenable thesis. To insist upon a judicial resolution of this case, given the facts and record at hand, arguably suggests a lack of common sense.
 
 
 53
 This brings me to my second concern, namely, that this may be one of those "hard cases" that has a high potential to produce "bad law." The diverse range of judicial opinions alone certainly suggests that, at a minimum, this is a case that finds no easy or consensus solution in the courts. And it is not entirely clear to me what has been achieved by this rather exhausting expenditure of judicial resources. Nevertheless, as a judge, my responsibility is to decide cases that are properly before the court, however questionable I may view the pursuit of litigation. I therefore turn to that task.
 
 II.
 
 54
 The opinions of Judges Wilkey and Mikva set forth fully the facts and history of this litigation, so I will not dwell on these details. In my view, the appellants' most potent challenge to the National Park Service's prohibition against camping is that the revised regulations, as applied to bar one aspect of their demonstration, infringe upon their First Amendment rights. To address this challenge, it is necessary to determine whether sleeping under the circumstances of this case constitutes "speech" protected by the First Amendment. I believe that it does, and that the Park Service's total ban against sleeping cannot withstand scrutiny under the test set forth by the Supreme Court in United States v. O'Brien, 391 U.S. 367, 376-77, 88 S.Ct. 1673, 1678-1679, 20 L.Ed.2d 672 (1968).[1]
 
 
 55
 The determination whether the challenged regulations infringe upon the appellants' First Amendment rights depends largely on one's characterization of their proposed activity. In some cases, sleeping in the park may be wholly facilitative. Here, it is undeniably true that the appellants' sleeping is in part facilitative; the appellants have stated, numerous times, that sleeping is necessary to attract demonstrators and capture media attention. But there is more to it than that, for "in this case sleeping itself may express the message that these persons are homeless and so have nowhere else to go." Community for Creative Non-Violence v. Watt, 670 F.2d 1213, 1216-17 (D.C.Cir.1982). A nocturnal presence at Lafayette Park or on the Mall, while the rest of us are comfortably couched at home, is part of the message to be conveyed. These destitute men and women can express with their bodies the poignancy of their plight. They can physically demonstrate the neglect from which they suffer with an articulateness even Dickens could not match.
 
 
 56
 The Supreme Court has not bound the First Amendment to any simplistic speech/conduct distinction. It has extended heightened scrutiny to governmental regulation of a wide variety of expressive activities, including leaf-letting, marching, wearing armbands, burning draftcards, and dancing. The sleeping proposed by the appellants is, in the circumstances of this case, every bit as expressive as those activities. In Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam), the Supreme Court afforded First Amendment protection to a peace symbol attached to an American flag in the context of demonstrations against the bombings in Cambodia and the Kent State killings. "An intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." Id. at 410-11, 94 S.Ct. at 2730-2731. Similarly, in this case there is both a "particularized message" appellants wish to convey by sleeping in the park and a reasonable expectation that the message will be understood by those who view it.
 
 
 57
 Thus, sleeping in this case is symbolic speech within the pale of the First Amendment. Accordingly, the regulations at issue here, which have been applied as a total ban against the appellants' sleeping in the park, must satisfy the O'Brien test in order to pass constitutional muster.III.
 
 
 58
 In Part III.A. of his opinion, Judge Wilkey assumes (correctly, I believe), that the sleeping proposed by the appellants is properly considered "speech" that is protected by the First Amendment. To the extent that he equivocates on this point, I disagree with the suggested analysis.
 
 
 59
 As I have already suggested, Spence v. Washington establishes the applicable framework for determining whether activity is "speech" protected by the First Amendment. Spence, which was decided six years after O'Brien, also clearly answers the question intimated in O'Brien regarding the "variety of conduct [that] can be labeled 'speech.' " United States v. O'Brien, 391 U.S. at 376, 88 S.Ct. at 1678. The Spence test ensures that the "variety of [such] conduct" is not "limitless." Id. Thus, if Judge Wilkey means to rely on a passing statement by the O'Brien Court to suggest that we should draw artificial lines between "speech" and "conduct" to discern protected activity, I would reject this as a flawed analysis. As has been aptly noted:
 
 
 60
 A constitutional distinction between speech and nonspeech has no content. A constitutional distinction between speech and conduct is specious.... There is nothing intrinsically sacred about wagging the tongue or wielding a pen; there is nothing intrinsically more sacred about words than other symbols. Other kinds of communication are also effective--... saluting a flag, kneeling in worship, holding a beloved hand. Even singular, idiosyncratic forms of expression can prove no less articulate, as when ... the King of Denmark wore a six-pointed star.
 
 
 61
 The Constitution protects freedom of "speech," which commonly connotes words orally communicated. But it would be surprising if those who poured tea into the sea and who refused to buy stamps did not recognize that ideas are communicated, disagreements expressed, protests made other than by word of mouth or pen.
 
 
 62
 Henkin, The Supreme Court, 1967 Term--Foreword: On Drawing Lines, 82 HARV.L.REV. 63, 79 (1968) (footnote omitted).
 
 
 63
 I also find specious the argument that in order to judge expressive activity of the sort here in question the government might be forced to draw distinctions among groups depending on the content of their message. Any such "content evaluation" by the government clearly is prohibited under the First Amendment. But, as the Spence Court obviously recognized in adopting a contextual approach, it is one thing for government officials to determine whether a message is intended (and may reasonably be understood as such) and quite another for them to judge the substantiality or value of a given message. The former determination, condoned by Spence, does not involve any prohibited content evaluation.
 
 IV.
 
 64
 Beyond his Part III.A., however, I agree with the analytical framework and mode of analysis adopted by Judge Wilkey to determine whether the activity proposed by the appellants is constitutionally protected. Excluding Part III.A., my principal disagreement with Judge Wilkey concerns the application of the "less restrictive alternative" test, a matter to which I will turn shortly. There are two other points of analysis at which we may part company; both deserve brief mention.
 
 
 65
 At one point in his opinion, Judge Wilkey suggests that "[t]he convenience of the demonstrators and the media value of their message will rival in importance the First Amendment aspects of the camping and thereby further diminish the claim that their First Amendment interest is substantial relative to the government's interest in preventing camping generally" (emphasis added). I reject this conclusion primarily because I can find no suggestion in the case law that a court must weigh the facilitative versus the expressive aspects of a speaker's conduct to determine the applicability of First Amendment rights. In other words, a message is not less deserving of First Amendment protection merely because the manner used to express it serves other needs of the demonstrators. The important questions are, simply, whether the demonstrators intend to communicate a message and, viewed in context, whether it is reasonably likely that passersby will understand the message.
 
 
 66
 Judge Wilkey also observes that "[c]amping in the park ... is not a traditional form of speech." To some this might imply a sort of hierarchy of protection resting on the form of expression. Although I do not read Judge Wilkey's opinion to embrace this suggestion, I would categorically reject any such implication.
 
 
 67
 Apart from these two notes, one of disagreement and one of clarification, and excluding his Part III.A., I accept Judge Wilkey's analytical framework for an assessment of the constitutional interests in this case. When we consider the question whether there exist any less restrictive alternatives to a total ban on sleeping, however, I part company with the conclusions reached by my colleague.
 
 
 68
 If I read his opinion correctly, the essence of Judge Wilkey's argument is that the only feasible alternatives available to the government are to permit all camping or to ban all camping.[2] Thus, he concludes:
 
 
 69
 If it were possible to accommodate [the appellants'] most effective mode of expression without exposing the parks to the harms anticipated by the regulation, then the First Amendment might well require that accommodation. The crucial and dispositive aspect of this case is that there is no possibility of a constitutionally acceptable less restrictive alternative. The Park Service must either allow all camping or abide by a flat-out ban.
 
 
 70
 (emphasis in original).[3]
 
 
 71
 Initially, I would note--consistent with the observation of Judge Mikva--that the Park Service does not presently impose a "flat-out ban" against all aspects of camping. As Judge Wilkey acknowledges, the erection and use of tents, coupled with a 24-hour presence, are integral aspects of camping. Nevertheless, they are not forbidden by the regulations, at least where a symbolic purpose is asserted.
 
 
 72
 More importantly, Spence's very sensible contextual standard for the identification of symbolic speech provides a ready basis for differentiating protected from unprotected sleeping. I have no doubt that the government may forbid sleeping in the parks that is in no sense expressive. It is of course possible, as Judge Wilkey points out, that some persons may fabricate an expressive purpose for sleeping in the parks. I, for one, however, doubt that hordes of tourists or others without an expressive purpose will descend on the parks; more comfortable accommodations are available elsewhere, and the permit application process will surely screen out many individuals who are unwilling to represent their true purpose in an official proceeding.
 
 
 73
 Nevertheless, I am willing to concede, for argument's sake, that a substantial number of persons may wish to sleep in the parks for assertedly expressive purposes. I do not believe, however, that this negates the obligation of the government to consider less restrictive alternatives to a total ban against sleeping. Our Constitution will not tolerate a total prohibition on the exercise of a constitutional right merely because a large number of persons wish to assert that right. Although reasonable time, place, and manner restrictions may be appropriate, an absolute ban on protected activity cannot be justified by the possibilities that the activity will be extremely popular or that some mischievous citizens occasionally will attempt to deceive the Park Service into believing that their conduct is expressive.
 
 
 74
 Concededly, the Park Service has legitimate interests in preventing some of the effects associated with widespread, full-scale camping in certain parks. In recognizing this, however, I stress that the government's interest is not in preventing sleeping per se, but in preventing the adverse effects associated with camping. For example, the government may legitimately seek to ensure that noncampers are not deprived of use of the parks, to prevent damage to park resources, and to minimize sanitation and law enforcement problems. But neither the District Court nor the Park Service explored ways in which these interests could be served through regulatory measures short of a total ban on sleeping in the parks.
 
 
 75
 I believe that there are several reasonable time, place, and manner restrictions that, if employed, would result in regulatory alternatives less restrictive of demonstrators' rights than a total ban against sleeping and, yet, still would accommodate the significant governmental interests at stake. For instance, in order to enforce legitimate rules against fire building, cooking or storage of personal belongings at a demonstration site, the Park Service may easily use its permit revocation procedure, see 36 C.F.R. Sec. 50.19(f) (1982), to revoke the permits of demonstrators whose sleeping expands to these other impermissible areas of nonexpressive activities. I believe, moreover, that the Park Service may legitimately limit the number of persons allowed to sleep in the parks at one time (to avoid problems of health and congestion), and allocate the available space among competing groups on a first-come, first-served basis. Government officials also may limit or prevent the storage of personal belongings, and perhaps prevent any individual from sleeping in the parks beyond a specified, successive number of hours or days. This list, of course, is not intended to exhaust the possibilities, but I emphasize that any restrictions imposed by the Park Service should be the least restrictive means by which the government's legitimate purposes can be attained.
 
 
 76
 In short, I believe that the appellants' proposed sleeping is expressive in nature and that the Park Service has not justified a total ban on that activity. Although a ban on camping does serve legitimate governmental interests, those interests can be protected by means less restrictive of the First Amendment rights of the appellants and other demonstrators. I would, therefore, reverse the decision of the District Court.
 
 
 77
 GINSBURG, Circuit Judge, concurring in the judgment:
 
 
 78
 Judge Mikva's opinion holds that the Park Service has not adequately justified the prohibition of sleeping by demonstrators granted permits to pitch sixty tents at symbolic campsites and to maintain a round-the-clock presence at those sites.[1] While I concur in the court's judgment, I find the case close and difficult.[2] For the reasons indicated below, I share Judge Edwards' concern that this case "has a high potential to produce 'bad law.' "[3]
 
 
 79
 That potential is revealed most conspicuously, I believe, in the separate dissenting opinion of Judge Scalia. His opinion would deny full free speech protection to any expression of ideas or feelings through symbols other than words. According to Judge Scalia, only "spoken and written thought" fall within the Constitution's core guarantee against government regulation "abridging the freedom of speech, or of the press."[4] Others have elegantly stated why Judge Scalia's narrow reading of the safeguard placed first in the Bill of Rights, his separation of language from other expressive symbols, will not do. I note such commentary[5] in this statement and, to avoid lengthening the packet of opinions, quote here only these relevant lines: "The Constitution protects freedom of 'speech,' which commonly connotes words orally communicated. But it would be surprising if those who poured tea into the sea and who refused to buy stamps did not recognize that ideas are communicated, disagreements expressed, protests made other than by words of mouth or pen." Henkin, supra note 5, at 79. Under the First Amendment the relevant inquiry should be "whether meaningful symbols ... are being employed by one who wishes to communicate to others"; the extent of protection should not depend upon whether words, pictures, emblems, or other comprehensible means of conveying a message are employed. Nimmer, supra note 4, at 61.
 
 
 80
 Numerous cases can be conceived to illustrate the arbitrary, less-than-fully baked flavor of Judge Scalia's theory. For economy, I indicate one category of examples in which his attempt at tight, tidy analysis does not yield sensible results. Assume a municipality enacts an antilittering ordinance that prohibits distribution of unsolicited materials to passersby in streets or other public places. This ordinance is passed for health, safety, and aesthetic reasons. A person hands out leaflets on a street corner; the leaflets contain words conveying a political message. Under Judge Scalia's approach, one must balance the government's interests in clean streets against the leafleter's First Amendment interest because the antilittering law, though aimed at the non-communicative aspect of the activity, impinges on the distribution of printed words, core "speech" for Judge Scalia.
 
 
 81
 A second person, on the same street corner, distributes small paper American flags (on Memorial Day), red poppies (on Veterans' Day), yellow ribbons (while American hostages are being held in Iran), green ribbons (while young blacks are being murdered in Atlanta), or peanuts or jelly beans (during a heated presidential campaign). The law as applied to this distributor, according to Judge Scalia, would attract only minimal scrutiny because it is aimed at the non-communicative collateral consequences of nonverbal, albeit expressive, symbols, which are not "speech" under Judge Scalia's theory. Judge Scalia would, therefore, presumably uphold application of the ordinance against this distributor because it would meet the minimal rationality equal protection standard.
 
 
 82
 The second distributor's symbols, however, convey as strong a message as spoken or printed words. That the two distributors might be treated differently under Judge Scalia's theory strays far from "common and common-sense understanding." Scalia Opinion at 622. That the two might be treated equally under Judge Scalia's theory if the second distributor prints a word--any word--on the object distributed, demonstrates the ultimately untenable character of the attempted distinction.
 
 
 83
 I am troubled too by an idea tried out tentatively in Judge Wilkey's dissenting opinion relating to the appropriate classification of the "free speech" interest asserted. A workable approach to expressive symbols or conduct, Judge Wilkey's dissent suggests, might distinguish "traditional communicative activit[y]" (marching and picketing are so described), from non-traditional, even if equally communicative, activity (wearing armbands and displaying symbolic flags are cited in this category): all conduct would count as "speech" sheltered from "proscription specifically designed to suppress expressive connotation"; only "traditional activities" would "qualify for purposes of avoiding a general prohibition not directed at communicative content."[6] Case law does not so compartmentalize conduct that has no purpose other than expression,[7] and I do not grasp the sense of, or the need for, the suggested two-level approach.[8] Why should marching attract full "free speech" protection while armband-wearing attracts less complete insulation; why should courts stamp speaking with one's feet "traditional" but flying a symbolic flag non-traditional?[9]
 
 
 84
 At the same time, I hesitate, more than Judge Mikva and Judge Edwards do, to treat the on-site sleep of a round-the-clock demonstrator as indistinguishable for the purpose at hand from the soap box speech, leaflet distribution, protest march, armband or flag display. CCNV's sleep may speak "poignantly" to passersby, but it is not designed "100%" as expression.[10] It has a more commonly recognized aspect;[11] sleep enables the round-the-clock demonstrator to face the next day without exhaustion. "Speech plus" is a label that has been misused in other contexts,[12] but CCNV's case may be an instance in which the description is appropriate.
 
 
 85
 Still, the personal, non-communicative aspect of sleeping in symbolic tents at a demonstration site bears a close, functional relationship to an activity that is commonly comprehended as "free speech": sleeping in the tents, rather than simply standing or sitting down in them, allows the demonstrator to sustain his or her protest without stopping short of the officially-granted round-the-clock permission. For me that linkage, while it does not mean CCNV's request should attract automatic approval, suffices to require a genuine effort to balance the demonstrators' interests against other concerns for which the government bears responsibility.
 
 
 86
 I am mindful of the Park Service argument that it has gone beyond the "free speech" requirement in permitting as many round-the-clock demonstrators as CCNV requested and as many tents, and that judgment against it would penalize the Service for its generosity. Nonetheless, in shaping rules of access to a public forum for demonstrations of ideas and protests,[13] the Service, even when it has generously allocated time and space, must steer clear of arbitrary or incoherent regulation. Judge Mikva and Judge Edwards have suggested that controls tighter than those now in effect might be put in place by the Park Service without affront to the First Amendment.[14] They reason, however, and I agree, that it is not a rational rule of order to forbid sleeping while permitting tenting, lying down, and maintaining a twenty-four hour presence.
 
 
 87
 In sum, in reviewing regulation of the time, place, and manner of expressive activity, I believe courts should draw no bright line between verbal speech and other comprehensible symbols of expression, or between "traditional communicative activit[y]"[15] and non-traditional modes of expression. While a more rational line perhaps might be drawn distinguishing unambiguously communicative activity, traditional or not, from activity that reflects a mixture of motives, I would not draw that line in this case. The non-communicative component of the mix reflected in CCNV's request for permission to sleep at the authorized symbolic campsite facilitates expression and should therefore attract ordering rules that are sensible, coherent, and sensitive to the speech interest involved. In my view, the Park Service determination does not satisfy that measurement. I therefore concur in the court's judgment.
 
 
 88
 WILKEY, with whom joined TAMM, MacKINNON, BORK, and SCALIA, Circuit Judges, dissenting:
 
 
 89
 This case raises a number of questions concerning the protection to be afforded symbolic speech and the extent to which, by neutrally drafted and applied regulations, the government may limit First Amendment access to a traditional public forum. In particular we must decide whether a general ban on camping in the Memorial core area parks of the District of Columbia can be applied to prevent camping that constitutes an integral and expressive part of a demonstration otherwise protected by the First Amendment.
 
 I. BACKGROUND
 
 90
 The Community for Creative Non-Violence (CCNV), an unincorporated religious association working on behalf of homeless persons, applied to the National Park Service for a permit to hold a demonstration in Lafayette Park and on the Mall beginning 21 December 1982. CCNV proposed to erect sixty tents in which an estimated 150 demonstrators would sleep in order to draw attention to the plight of the homeless during winter.
 
 
 91
 The Park Service granted CCNV a permit to erect two symbolic tent cities, one on the Mall with forty tents, and one in Lafayette Park with twenty tents. Permission to sleep in the tents, however, was denied pursuant to Park Service regulations governing camping and the erection of temporary structures for living accommodation.[1]
 
 
 92
 CCNV and several homeless men then sued in district court for an injunction to prevent the Park Service from enforcing its regulations against them. They alleged four grounds in support of their suit: first, that the regulations are void for vagueness and overbreadth; second, that the regulations do not in fact prohibit their proposed demonstration; third, that the regulations have been discriminatorily enforced in violation of their First and Fifth Amendment rights; and, finally, that the regulations cannot be construed to prevent the demonstration without running afoul of the free speech guarantees of the First Amendment.
 
 
 93
 Following a hearing, the district court denied plaintiffs' motion for a preliminary injunction and for summary judgment, and instead granted summary judgment for the Park Service.[2] CCNV immediately filed a notice of appeal and a motion for an injunction pending appeal, which was denied by the district court. An emergency motion for injunction pending appeal was also denied by a panel of this court.[3] The appeal, however, was set for expedited en banc consideration to allow for a determination on the merits.
 
 II. PRELIMINARY QUESTIONS
 
 94
 Three of appellants' four contentions can be disposed of without difficulty. Indeed, a mere citation of the regulations at issue suffices to show that they prohibit the sleeping proposed by CCNV and that they are neither vague nor overbroad under applicable Supreme Court precedent. Furthermore, the district court explicitly found that the regulations have not been discriminatorily enforced. This finding is supported by undisputed evidence and therefore must be upheld.
 
 
 95
 The camping regulations of the National Capital Region were revised in June of 1982 after formal rulemaking proceedings.[4] The revisions responded to a recent decision of this court holding that a prior, almost identical demonstration proposed by CCNV was not prohibited by the regulations as then written.[5] The panel opinion relied upon a Policy Statement accompanying the regulations which drew a distinction between the permissible "use of symbolic campsites reasonably related to First Amendment activities" and impermissible "camping primarily for living accommodations ...." Noting that "the purpose of the symbolic campsite in Lafayette Park is 'primarily' to express the protestors' message and not to serve as a temporary solution to the problems of homeless people," the panel concluded that the regulations allowed appellants to sleep in the tents as an intrinsic part of their protest.[6]
 
 
 96
 No such statutory solution is available to us. As noted, the regulations were revised after the panel decision.[7] These revisions clarify the definition of the term "camping" as used in 36 C.F.R. Sec. 50.27, which prohibits camping in park areas not designated as public campgrounds. The revisions also clarify section 50.19, which covers the use of temporary structures in connection with permitted demonstrations and special events.
 
 
 97
 As revised, 36 C.F.R. Sec. 50.27(a) prohibits camping in park areas not designated as public camping grounds, and defines the terms as follows:
 
 
 98
 Camping is defined as the use of park land for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities. The above-listed activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging.
 
 
 99
 Section 50.19(e)(8), as amended, permits the erection of temporary structures for the purpose of symbolizing a message or meeting logistical needs in conjunction with an authorized demonstration, but prohibits the use of temporary structures for camping outside of designated areas for
 
 
 100
 living accommodation activities such as sleeping, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or doing any digging or earth breaking or carrying on cooking activities. The above-listed activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging.
 
 
 101
 There is no single activity that automatically triggers the application of these sections. Thus, someone might take a noon-time nap in the park without violating them. Similarly, in conjunction with a demonstration one may erect a symbolic tent in which no one will actually be sleeping or may use "support service tents" for first aid facilities, lost children areas, or to shelter electrical and other sensitive equipment or displays.[8] Only when all the circumstances are taken into account can it be determined with certainty whether a particular person or group is "camping" within the meaning of the regulations.
 
 
 102
 The determination required is not a difficult one. We all have a common-sense understanding of what camping is, and the regulations aid that understanding by giving specific examples of activities that constitute camping "when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation...."[9]
 
 
 103
 Appellants propose to erect tents and to occupy those tents, by sleeping in them at night, for the remainder of winter.[10] Given that "camping" is defined "regardless of the intent of the participants or the nature of any other activities in which they may also be engaging," what appellants propose is clearly camping. Appellants' First Amendment intent does not take them outside the scope of the regulations.
 
 
 104
 Furthermore, the regulations give fair notice of the prohibited conduct and provide sufficiently explicit standards to guide the discretion of law enforcement officials.[11] They are not impermissibly vague.[12] Neither are they overbroad. Appellants argue that their proposed camping constitutes symbolic speech meriting First Amendment protection. They further argue that the Park Service regulations impermissibly infringe upon that speech. These questions will be considered in due course.[13] But it is not necessary to decide them in order to reject appellants' overbreadth challenge.
 
 
 105
 When, as here, an enactment is directed at conduct rather than at speech, "overbreadth scrutiny has generally been somewhat less rigid" so long as the statute regulates the conduct in a "neutral, noncensorial manner."[14] "[T]he overbreadth of [such] a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."[15] Even assuming there is such a thing as "expressive camping" that merits First Amendment protection from incidental infringement, that expressive camping constitutes only a small fraction of the general camping prohibited by the regulations. It cannot be said that a general ban on camping is substantially overbroad simply because it encompasses occasional instances of expressive camping.
 
 
 106
 Finally, we agree with the finding of the district court that the Park Service has enforced its new regulations "in an evenhanded and reasonable manner."[16] This finding is based on and amply supported by undisputed facts contained in a number of exhibits and affidavits filed with the district court by the Park Service.
 
 
 107
 Appellants support their contention that the regulations are being enforced against them selectively and discriminatorily by referring to several past demonstrations in which sleeping allegedly occurred.[17] In judging the propriety of the grant of summary judgment for the Park Service, we must assume the truth of these factual allegations.[18] Even so, they fail to make out a claim of discriminatory enforcement in violation of the First and Fifth Amendments.
 
 
 108
 Some of the demonstrations relied upon by appellants[19] occurred before the effective date of the current revisions and are therefore largely beside the point. As for the three demonstrations taking place after that date, it is undisputed that in each instance the Park Service notified the participants that camping and the use of temporary structures for living accommodations was prohibited.[20] Furthermore, in the one case where the Park Service detected a violation of the regulations, it demanded compliance and the next day, after similar violations occurred, revoked the demonstration permit for non-compliance with the regulations and conditions of the permit.[21] A standard of reasonable, even-handed enforcement calls for no more.
 
 
 109
 At best appellants are able to cite two isolated instances of undiscovered violations of the regulations.[22] The district court rightly noted that this evidence failed to create a genuine issue of material fact.
 
 
 110
 The existence of possible undiscovered violations of the law is not the material issue here. Rather, the issue is whether or not there existed a policy or practice by the Park Service of permitting activities by other persons in violation of the regulations. Since plaintiffs' evidence goes only to the former proposition, not to the latter, it fails to establish a policy of discriminatory enforcement.[23]
 
 III. FIRST AMENDMENT CLAIM
 
 111
 We come, then, to the main focus of contention in this case. Appellants argue that the Park Service regulations, if construed to prohibit their proposed demonstration, impermissibly infringe upon rights guaranteed by the free speech clause of the First Amendment.
 
 A. Standard of Review
 
 112
 As a preliminary matter, we must determine whether the camping proposed by appellants is properly considered "speech" for purposes of the First Amendment protection claimed here. Thus, in United States v. O'Brien,[24] the case principally relied upon by Judge Mikva to establish his standard of First Amendment scrutiny, the Supreme Court began its analysis as follows:
 
 
 113
 We cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity.
 
 
 114
 Since the Court in O'Brien found that the governmental prohibition satisfied even the heightened scrutiny appropriate for laws that incidentally infringe on protected expression, it was not constrained to go back and reexamine the validity of its assumption that First Amendment standards of scrutiny applied. Judge Mikva, however--at least if he intends to rely upon O'Brien --must do so. He must validate the credentials that admit sleep, in this case, to the realm of the First Amendment without providing a blanket pass to "an apparently limitless variety of conduct [that] can be labeled 'speech.' "[25] No easy task, and not one which Judge Mikva has in our view successfully executed.
 
 
 115
 The attempt is made in an earlier portion of the opinion,[26] where two responses are given. First, the "indicia of political expression ... permeate CCNV's pointed use of the simple act of sleeping."[27] To determine communicativeness, Judge Mikva examines "the intent of the would-be communicator and the context in which his or her conduct takes place."[28] One might suppose from this, and from the quotation from Supreme Court authority which follows, that Judge Mikva means that here sleeping is a particularly apt method of expressing homelessness, the idea to be conveyed. Several pages later, however, the opinion abjures such an intent, warning (quite correctly, in our estimation) that basing the present decision upon CCNV's contention that "sleeping in its demonstration is uniquely deserving of first amendment protection because it directly embodies the group's message ... would require the government to draw distinctions among groups desiring to express themselves through sleeping depending on the subject matter or content of their message and its alleged relationship to sleep ...."[29] We add that it would also require the Park Service, and ultimately the courts, to make judgments that are more appropriate for Ingmar Bergman and Andy Warhol.
 
 
 116
 But if this symbolism-evaluation is not what Judge Mikva has in mind, then we are at a loss to understand the point. Does it mean that, since the particular activity of sleeping is expressive in this case (the one-and-only time we will engage in symbolism-evaluation for this particular category of conduct) it must always be assumed to be expressive in the future--so that hereafter one can sleep in the parks to protest war or to protest peace, to protest the arms race or to protest unilateral disarmament, all indiscriminately under the protection of the First Amendment?[30]
 
 
 117
 Judge Mikva's second basis for avoiding the preliminary inquiry of O'Brien is that the sleeping is part of a demonstration that is itself sufficiently communicative to implicate the First Amendment. In other words, "even were we not to focus on the peculiarly expressive nature of sleeping, first amendment scrutiny would still be implicated."[31] The idea seems to be that the First Amendment gives CCNV the freedom to shape the nature of its own demonstration and, therefore, a higher standard must be applied to justify the suppression of all requested elements of that demonstration--including those that are not even intended to be independently communicative.[32] We cannot accept this reasoning, which suggests that since, for example, a protest march (a traditional form of expressive conduct) cannot be banned without meeting the high First Amendment standards applicable to incidental infringements on speech, neither can any of the other activities which the organizing group believes will facilitate or improve the march.
 
 
 118
 We think that is plainly wrong. Not a whit more justification is needed to ban spitting in the street by a parade of tobacco farmers protesting a new tax on chewing tobacco than is needed to prevent such activity by the public at large. Any group's freedom to shape the nature of its own demonstration is limited by the well-established permissibility of "time, place and manner" limitations--the reasonableness of which is established so long as the First Amendment activity itself (the speech, the pamphleteering, the parade) is not needlessly impeded, regardless of the effect on ancillary phenomena. It is hard to believe that the limiting language in O'Brien, quoted above, means no more than that inherently unexpressive conduct need only be joined with expressive conduct or speech in order to qualify for First Amendment protection.
 
 
 119
 The Supreme Court cases, it must be acknowledged, do not provide guidance as to what conduct beyond traditional communicative activities such as marching and picketing may qualify as "speech." It might be suggested that only such traditional activities qualify for purposes of avoiding a general prohibition not directed at communicative content--while virtually all conduct is "speech" for purposes of avoiding a proscription specifically designed to suppress expressive connotation.[33] While this analysis may be consistent with the holdings of the Court, it is difficult to square with the fact that the O'Brien test itself (applied only after conduct has been assumed entitled to full "free speech" protection), contains a step that inquires into the communication-suppressing nature of the law. Unlike Judge Mikva, we find it unnecessary to solve this dilemma in the present case. Like the Supreme Court in O'Brien, we find that even assuming the applicability of the more demanding First Amendment standard of review, the regulations here pass muster.[34]
 
 
 120
 The standard of review provided by O'Brien is as follows:
 
 
 121
 [A] government regulation is sufficiently justified if it is within the constitutional power of the government; if it furthers a substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged first amendment freedoms is no greater than is essential to the furtherance of that interest.[35]
 
 
 122
 The first requirement, that the regulation be within the constitutional power of the government, is rarely a problem. The second and fourth requirements come together to constitute a balancing test, as discussed below.[36] Before one even reaches that balancing test, however, the interest offered by the government to support its regulation must meet the threshold requirement that it be "unrelated to the suppression of free expression." In other words, any burden imposed on free expression must be incidental to the prevention of a harm that arises regardless whether any message is conveyed. To illustrate, an attempt to curtail littering by banning handbills is not directed at any message to be conveyed. The feared harm would arise even if the handbills were blank.[37] Similarly, a ban on sound trucks is designed to prevent noisy disturbances, a harm that would arise even if the sound truck merely emitted static or other meaningless sounds.[38] An attempt to curtail the incitement of lawless action, on the other hand, is directed at a harm arising from the specific viewpoint expressed.[39] Similarly, a ban on foul language is concerned with the effects of the ideas or emotions expressed on the minds or conduct of those listening.[40] In these latter cases, the regulation will not survive judicial scrutiny unless the proscribed expression falls into one of several narrowly defined, unprotected categories.[41]
 
 
 123
 In the former set of cases, where the threshold test is met, then under O'Brien a balancing test is proper: the state must counterbalance any incidental infringement on free speech by showing that the regulation narrowly pursues a substantial governmental interest. This is properly characterized as a "balancing" test, because the greater protection that could be afforded speech by a less restrictive alternative must be balanced against that alternative's loss of efficiency in achieving the government's objective.[42]
 
 
 124
 In this case, the governmental interest alleged, the protection of the parks in the Memorial core area from physical and aesthetic damage caused by camping, is clearly unrelated to the suppression of free expression. The harm is the same whether appellants hope to express a message by camping or not. Thus, the court must balance the substantiality of the government's interest in preventing camping against the incidental infringement on free speech, taking due note of the possibility of any less restrictive alternative.
 
 B. Application of Standard
 
 125
 The three concepts upon which this case turns, "substantial interest," "incidental infringement," and "less restrictive alternative," are inherently vague. However, enough can be said about each, as applied to this case, to leave no doubt as to the proper result.
 
 1. Substantial Interest
 
 126
 Our first responsibility is to determine the exact nature and scope of the governmental interest called into question by this case. It is easy to make a mistake here, improperly expanding or contracting the scope of that interest. Two cautions are necessary. We should look to the regulations as applied to this case to determine the relevant class of activities that the government is interested in banning.[43] But we should not, in judging the substantiality of the interest underlying that ban, limit our consideration to the harms that might be caused by a particular sub-class of persons, such as appellants, desiring to perform those activities. In other words, we look to the overall benefit to be had from the general application of the regulations, but our understanding of the "regulations" is refined by reference to the activities in which appellants actually propose to engage.
 
 
 127
 Some of our colleagues seem to feel that in judging the substantiality of the government's interest the proper focus in this case is on the incidental harm that would be caused by allowing these appellants to sleep in the park as part of their proposed demonstration. They are mesmerized by the following scenario: the Park Service has already issued a demonstration permit that will allow appellants to construct a "symbolic city" and to maintain a round-the-clock presence at the site. Appellants may put up tents. They can place within those tents sleeping bags, cots, and other bedding materials. They can sit in the tents twenty-four hours a day. They can even lie down, close their eyes and feign sleep. The only thing they cannot do is actually fall asleep. What additional harm to the parks could possibly be caused by allowing appellants actually to sleep rather than merely feigning sleep?
 
 
 128
 This approach to the question at issue here misconceives the relevant First Amendment inquiry. The apparent absence of harm that would be caused by granting these appellants an exemption from the no-camping regulations may indicate that we should look for a possible, less restrictive alternative to the present regulations. It does not, however, in any way undermine the substantiality of the interest supporting the regulations as now written and applied generally by the Park Service. The Supreme Court has stated explicitly that in judging the substantiality of the government's interest we must look to the interest supporting the law generally, not the interest to be served by applying it in any particular case. The alternative is to nickel and dime every regulation to death.
 
 
 129
 The point was made most clearly and emphatically in the recent case of Heffron v. Int'l Soc. for Krishna Consc.[44] In that case a rule of the Minnesota Agricultural Society, a public corporation that operates the annual state fair, required all persons, groups or firms desiring to sell, exhibit, or distribute materials during the fair to do so only from fixed locations. The International Society for Krishna Consciousness, Inc. (ISKCON) claimed the rule violated their First Amendment rights because it suppressed the practice of Sankirtan, a religious ritual that enjoins its members to go into public places to distribute or sell religious literature and to solicit donations for the support of the Krishna religion. The Minnesota Supreme Court agreed.
 
 
 130
 The Minnesota Supreme Court recognized that the state's interest in the orderly movement of a large crowd and in avoiding congestion was substantial and that rule 6.05 furthered that interest significantly. Nevertheless, the Minnesota Supreme Court declared that the case did not turn on the "importance of the state's undeniable interest in preventing the widespread disorder that would surely exist if no regulation such as rule 6.05 were in effect" but upon the significance of the state's interest in avoiding whatever disorder would likely result from granting members of ISKCON an exemption from the rule. Approaching the case in this way, the court concluded that although some disruption would occur from such an exemption, it was not of sufficient concern to warrant confining the Krishnas to a booth.[45]
 
 
 131
 The United States Supreme Court, applying free speech (not freedom of religion) principles,[46] rejected this approach and upheld the rule. "The justification for the Rule should not be measured by the disorder that would result from granting an exemption solely to ISKCON."[47]
 
 
 132
 A similar mistake would be to focus our attention at this time solely on the harm that would be caused by allowing "First Amendment" camping (i.e., camping by any group, not just appellants, for whom the camping was an integral part of the message to be conveyed). Again, such an inquiry might indicate that we should look for a possible, less restrictive alternative to the present regulations. But it bears no relevance to the initial question of whether the regulations as now written and applied are supported by a substantial interest. Thus, in United States v. O'Brien,[48] the court focused on the government's interest generally in preventing the destruction or mutilization of registration certificates, whether or not that destruction or mutilization is for a First Amendment purpose. Again, any other approach would nickel and dime every regulation to death.
 
 
 133
 Thus, in the instant case, we must not measure the substantiality of the governmental interest by looking solely to the harm that might be caused by allowing these particular appellants to sleep in the park. Nor may we measure that interest by looking only to the harm that would be caused by allowing "First Amendment" camping. Rather, we must look to the interest in preventing camping by all classes of persons, whatever their motive.
 
 
 134
 Having fixed the relevant class of persons by reference to whom the interest in banning camping should be judged, we must still be very careful in stating what we mean by "camping." In this sense, the claims of these particular appellants are relevant. They do not propose to build fires, dig latrines, cook, etc. They propose only to erect tents, lay out bedding materials, and sleep through the nights for an extended period. Thus, we must judge the substantiality of the government's interest in preventing this class of activities. We do not add cooking, building fires, and digging latrines as make-weights because, even though they are forbidden by the regulations, appellants disclaim any intention of such activity.
 
 
 135
 The point made above is merely that we should not limit our consideration to a sub-class of persons desiring to perform these activities, such as appellants alone or, even, all those with a First Amendment purpose. But we must and do limit our attention to the class of activities actually called into question by this case. Thus, "camping" as used in the remainder of this opinion is limited to such activities as erecting tents or other structures, laying out blankets, sleeping bags, and other bedding materials, and sleeping.
 
 
 136
 The governmental interest called into question by this case is the prevention of harm that would be caused by camping, in the above sense, in the Memorial core area parks. However, a round-the-clock presence and the erection of symbolic structures, including tents, is allowed by the regulations in conjunction with a demonstration. Thus, the governmental interest is limited to the incremental harm which would be caused by permitting camping generally (i.e., not just for First Amendment purposes) in addition to the erection of tents and a 24-hour presence for demonstration purposes.[49]
 
 
 137
 Even as so stated, however, the substantiality of the governmental interest cannot be doubted. The proverbial "straw that broke the camel's back" is a valid and useful concept. The Park Service may in all good faith strive to be lenient, but nevertheless it is entitled to draw the line somewhere. If camping, whatever the purpose, were allowed in the parks of the Memorial core area, those parks would be overrun by campers during the summer months--the grass would be ruined, litter and human waste would abound, and the pleasure noncampers take in those parks would be ruined.
 
 
 138
 No such consequences can be anticipated from allowing symbolic structures and a 24-hour presence in the parks. Citizens are only likely to avail themselves of the latter privileges in order to express themselves on pressing issues, whereas camping would be useful to any tourist or visitor interested in minimizing expenses. Furthermore, the potential harm to the parks from persons who actually live there for their own convenience, persons who don't go home to eat, to wash, to sleep, to answer nature's call, etc., exceeds that to be expected from persons erecting symbolic structures or maintaining a wakeful vigil for First Amendment purposes.
 
 
 139
 It is important once again to recall that we are not yet concerned with the possibility of a less restrictive alternative that would permit First Amendment camping, while denying permission to all other campers. The regulations as written ban all camping, and it is the interest underlying that ban that we must now weigh. As the Park Service has noted, the parks in the Memorial core area, including the Mall and Lafayette Park, are simply unsuited for camping.[50] To permit camping would deprive other groups of the right to use nationally significant space. It would cause significant damage to park resources and a substantial increase in costs for park restoration, sanitary facilities, and extra park personnel.[51] Accordingly, the governmental interest supporting the ban on camping and the erection of structures for living accommodation is substantial.
 
 2. Incidental Infringement on Speech
 
 140
 In most of the symbolic speech cases, the activity that the government attempted to suppress was inherently expressive. Ninety-nine out of a hundred people who purposely burn their draft cards,[52] wear arm bands,[53] or superimpose a peace symbol on the flag,[54] will do so in order to express something thereby. Thus, a prohibition of that activity can have a substantial, even if incidental, impact on speech.
 
 
 141
 Camping as symbolic speech presents a very different case. Camping in the park has a great deal of independent significance. It is not a traditional form of speech. It has expressive First Amendment value only in a very limited set of circumstances.[55] Thus, if camping in the Memorial core area parks were permitted, the vast majority of those availing themselves of the privilege would not be intending to express anything thereby. Conversely, the incidental infringement on speech caused by an absolute ban on camping in these areas is simply not that great relative to the government's interest in preventing camping generally.
 
 
 142
 Appellants may well have hit upon the most expressive means of conveying their message. But they have also stated explicitly that their desire to camp in the parks is based not just on the expressive nature of those activities under the peculiar facts of this case, but also on the fact that camping would facilitate the expression both by attracting demonstrators and by capturing media attention. On the former point, appellants' original application is clear. "Without the incentive of sleeping space or a hot meal, the homeless would not come to the site."[56] This statement is constantly echoed in the papers filed with this court.[57] The latter point follows from the former. Without homeless people coming to demonstrate the poignancy of their plight, the media value of the message is sadly diminished, despite the unabated poignancy of that plight.[58]
 
 
 143
 The Supreme Court has noted time and again that although the First Amendment guarantees individuals and groups the right to deliver their message, it does not guarantee any right to deliver that message in the most effective manner possible.[59] It does not guarantee media attention. Nor does it guarantee circumstances that will attract the largest number of demonstrators.[60] Appellants' concerns in this case are not limited to a fear that their message, purely in terms of its content, will be diluted. They fear at least as much that the effect of their message, however well expressed, will be diminished.
 
 
 144
 Of course, we must not make the "category mistake" noted above in conjunction with the substantial interest test. Just as the substantiality of the government's interest must be judged by the effect of the law on all persons, so, too, the extent to which it infringes upon speech must be judged by the effect of the law on all persons, and not just by its effect on the appellant. However, the conjunction of the facilitative and expressive aspects of camping in this case is likely to be paralleled in all other First Amendment camping cases. The convenience of the demonstrators and the media value of their message will rival in importance the First Amendment aspects of the camping and thereby further diminish the claim that their First Amendment interest is substantial relative to the government's interest in preventing camping generally.
 
 
 145
 Judge Edwards correctly notes that "a message is not less deserving of First Amendment protection merely because the manner used to express it serves other needs of the demonstrators."[61] But where there are plenty of alternative ways to express the same message--ways which, though less convenient to the demonstrators, are not fraught with the same harms to legitimate governmental interests--the First Amendment does not extend special protection to the means chosen by the demonstrators, especially where those means are chosen as much for convenience as for expressive value. To repeat, the First Amendment does not guarantee any right to deliver a message in the most effective manner possible. Nor does it guarantee any right to deliver a message in the most convenient way possible.
 
 
 146
 In sum, the substantiality of the government's interest in preventing camping generally in the Memorial core area parks appears to counterbalance the occasional, incidental infringement on speech caused by the regulations.
 
 3. Less Restrictive Alternative
 
 147
 It is important to recognize that appellants wish to conduct their demonstration in a park, a forum traditionally open to the public "for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."[62] Modes of First Amendment activity, such as leafletting and demonstrating, which can be banned from certain locations, such as courthouses,[63] jails,[64] and private shopping centers,[65] cannot be abridged or denied in traditional public forums such as the streets[66] and parks.[67] The right to speak in a public forum may be regulated in the interest of all, "but it must not, in the guise of regulation, be abridged or denied."[68]
 
 
 148
 Appellants argue, relying on this notion that the park is a public forum, that the government must permit exceptions to its ban on camping where the camping is an integral part of First Amendment expression. In other words, appellants argue that the mere fact that the ban is neutral and supported by a substantial governmental interest is insufficient. Some affirmative accommodation of First Amendment interests is necessary in a public forum.
 
 
 149
 The total ban on "camping" sweeps within its purview First Amendment activities that pose no danger to the alleged governmental interest. Prohibition of peaceful sleeping inside lawfully erected tents as part of a demonstration serves no purpose other than to impermissibly suppress free expression.[69]
 
 
 150
 Anatole France once said: "The law in its majestic equality forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread."[70] The sarcasm is salutory. Appellants are among the most helpless members of our society. They are likely to be uneducated and inarticulate. If it were possible to accommodate their most effective mode of expression without exposing the parks to the harms anticipated by the regulation, then the First Amendment might well require that accommodation. The crucial and dispositive aspect of this case is that there is no possibility of a constitutionally acceptable less restrictive alternative. The Park Service must either allow all camping or abide by a flat-out ban. Any intermediate position designed to accommodate "First Amendment camping" would run afoul of the proscriptions against discretionary screening contained in a long line of Supreme Court cases.[71] The Supreme Court has, in effect, endorsed Anatole France's "majestic equality" as applied to free speech because only totally objective standards will suffice in this area, whatever differentiations there may be in welfare policies.
 
 
 151
 The teaching of this line of cases is that licensing regulations, to pass constitutional scrutiny, must contain "narrow, objective, and definite standards to guide the licensing authority,"[72] and thereby protect against arbitrary action or de facto censorship of certain points of view. It is just such standards that would be impossible to formulate if the court tried to carve a First Amendment exception out of the ban on camping. First Amendment standards cannot themselves be used to state an exception to a neutral regulation of conduct.
 
 
 152
 The force of this point can be seen by considering the following three examples, asking in each instance whether the Park Service would have to grant a permit to camp under a judicially mandated First Amendment exception to the ban on camping.
 
 
 153
 (1) A group of tourists comes to D.C. during the summer. Rather than pay to stay in a hotel, they apply for a permit to camp on the Mall "to dramatize and protest against the high cost of hotels."
 
 
 154
 At oral argument appellants stated that this would be a "frivolous case." We agree. But according to what standard is the Park Service to deny the permit? The Park Service cannot be permitted to discriminate between applicants based on the supposed substantiality of their message. That would be content screening in its most blatant form. "[A]bove all else, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.[73] Nor could the Park Service screen applicants on the basis of their sincerity, their commitment to the message they are trying to convey. It is not for the Park Service to decide who really believes that high hotel prices are harmful to the republic and should be regulated by government and who just wants a free place to sleep.
 
 
 155
 The problem stems from the fact, noted above, that many people, without any First Amendment purpose, would like to camp. The benefits of camping in a convenient location on the Mall will provide them with an incentive to offer a First Amendment pretext for the camping. On the other hand, few would go to the trouble of erecting a temporary structure on the Mall or maintaining a wakeful 24-hour vigil unless they wanted to express something thereby, however inane or frivolous. There could be little other reason for erecting such structures or maintaining such a vigil. Thus, the question of sincerity doesn't arise, and, consequently, the Park Service need not distinguish between substantial and frivolous messages. Applicants for a permit are left to determine for themselves whether their message is "significant" enough to be worth the trouble.
 
 
 156
 Where camping is concerned the problem of pretextual or frivolous speech is much more important. Presumably, there are a great many people who would like to camp on the Mall or in Lafayette Park, at least during the summer, and would do so if permitted. If we force the Park Service to open the gate for this group because of their sincerity and the substantiality of their message, we will force the Park Service either to screen applicants on that basis or to permit anyone to camp who is willing to offer a First Amendment rationalization, however ludicrous or improbable.
 
 
 157
 (2) A citizen, in order to demonstrate the depth of his commitment to arms control, resolves to remain in Lafayette Park until all nuclear weapons are destroyed.
 
 
 158
 Here the message is obviously substantial, and the citizen's commitment to it we may assume is sincere. But the Park Service, to keep him from making Lafayette Park his home for the rest of his life, would have to deny the permit on the grounds that the mode of expression (camping) is not sufficiently related to the message to be conveyed to justify giving the citizen permanent squatter's rights. In other words, he can make his point by other, less intrusive means. But how is the Park Service to make such a determination with any clarity? Suppose the citizen's tent were shaped like a coffin and he maintained that his constant presence was necessary to dramatize the unnatural death that awaits us all. Can we really expect the Park Service in issuing a permit to decide in each case whether the fit between the means employed and the message to be conveyed is close enough to justify the particular means? We cannot; at least not without running afoul of the constitutional requirement that standards be "narrow, objective, and definite."
 
 
 159
 The point of these two examples is that First Amendment standards cannot themselves be used to state an exception to a neutral regulation of conduct. The First Amendment does not provide sufficiently "narrow, objective and definite standards" to guide a licensing authority. We cannot simply say: First Amendment camping may not be banned, even though all other camping is banned.
 
 
 160
 The final example presents an extreme case of the frivolous speech problem. It demonstrates that any attempt to create an explicit First Amendment exception to a neutral regulation of conduct itself provides a foolproof means of evading that regulation.
 
 
 161
 (3) This court rules that the Park Service must permit a First Amendment exception to its ban on camping in the Memorial core area parks. A group of citizens here on holiday, with homes of their own and no particular gripe with hotel prices (other than a disinclination to pay them), applies for a First Amendment camping permit "to demonstrate the absurdity of the holding of the D.C. Circuit Court of Appeals that allows us to camp on the Mall."
 
 
 162
 Here, the message is substantial, the parties might well be sincere, and the means-end fit is perfect. The Park Service, it appears, would have no choice but to issue the permit. In other words, if we create a First Amendment exception to the ban on camping, the exception will completely swallow the rule. Anyone and everyone who is willing to apply for a permit and recite the above First Amendment purpose must be allowed to camp, subject to a first come-first served limitation.[74]
 
 
 163
 In sum, it is not possible to construct a less restrictive alternative to the flat-out ban on camping at issue here. Thus, given that the governmental interest supporting the total ban is substantial and that the incidental infringement on free expression, relative to the valid purposes served by the rule, is not significant, the regulation should be upheld.
 
 
 164
 As evidenced by the four opinions reflecting the views of our six colleagues agreeing on the result, it seems apparent that they are quite sure that these appellants should be allowed to sleep in Lafayette Park, but they have had great difficulty in figuring out why. We five in dissent, assuming that free speech principles apply, find no difficulty in sustaining this Park Service regulation permitting every type of communicative action, but drawing the line at "camping," i.e., actually occupying living accommodations in Lafayette Park 24 hours a day for days on end. United States v. O'Brien, supra; Heffron v. Int'l Soc. for Krishna Consc., supra.
 
 
 165
 SCALIA, Circuit Judge, dissenting, with whom Circuit Judges MacKINNON and BORK concur:
 
 
 166
 I concur with the principal dissent in this case because I agree that, if traditional First Amendment analysis is applied to this sleeping, on the assumption that it is a fully protected form of expression, the appellants would nonetheless lose. I write separately to express my willingness to grasp the nettle which the principal dissent leaves untouched, and which the opinions supporting the court's disposition consider untouchable--that is, flatly to deny that sleeping is or can ever be speech for First Amendment purposes. That this should seem a bold assertion is a commentary upon how far judicial and scholarly discussion of this basic constitutional guarantee has strayed from common and common-sense understanding.
 
 
 167
 I start from the premise that when the Constitution said "speech" it meant speech and not all forms of expression. Otherwise, it would have been unnecessary to address "freedom of the press" separately--or, for that matter, "freedom of assembly," which was obviously directed at facilitating expression. The effect of the speech and press guarantees is to provide special protection against all laws that impinge upon spoken or written communication (which I will, for the sake of simplicity, refer to generically as "speech") even if they do so for purposes that have nothing to do with communication, such as the suppression of noise or the elimination of litter. But to extend equivalent protection against laws that affect actions which happen to be conducted for the purpose of "making a point" is to stretch the Constitution not only beyond its meaning but beyond reason, and beyond the capacity of any legal system to accommodate.
 
 
 168
 The cases find within the First Amendment some protection for "expressive conduct" apart from spoken and written thought. The nature and effect of that protection, however, is quite different from the guarantee of freedom of speech narrowly speaking. It involves a significantly different balancing of private rights and public interests, and does not always call for the detailed "First Amendment analysis" characteristic of the speech cases and applied by the majority opinions here. Specifically, what might be termed the more generalized guarantee of freedom of expression makes the communicative nature of conduct an inadequate basis for singling out that conduct for proscription. A law directed at the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires. But a law proscribing conduct for a reason having nothing to do with its communicative character need only meet the ordinary minimal requirements of the equal protection clause.[1] In other words, the only "First Amendment analysis"[2] applicable to laws that do not directly or indirectly impede speech is the threshold inquiry of whether the purpose of the law is to suppress communication. If not, that is the end of the matter so far as First Amendment guarantees are concerned; if so, the court then proceeds to determine whether there is substantial justification for the proscription, just as it does in free-speech cases.
 
 
 169
 Thus, the First Amendment's protection of free speech invalidates laws that happen to inhibit speech even though they are directed at some other activity (sound amplification,[3] campaign contributions,[4] littering[5]). The more limited guarantee of freedom of expression, by contrast, does not apply to accidental intrusion upon expressiveness but only to purposeful restraint of expression. It would not invalidate a law generally prohibiting the extension of limbs from the windows of moving vehicles; it would invalidate a law prohibiting only the extension of clenched fists.
 
 
 170
 I believe the foregoing analysis is consistent with all of the Supreme Court's holdings in this field. I would be content to consign marching and picketing, as the principal dissent suggests, to a category of traditionally expressive conduct which itself qualifies as speech, and thus does not require a showing of expression-suppressing intent. I do not think that exception is necessary, however, to explain the cases. The marching and picketing holdings represent not conduct protected because it is in itself expressive, but rather what the cases and commentators call "speech-plus"[6]--conduct "intertwined"[7] or "intermingled"[8] with speech. The union organizer, for example, cannot convey his spoken or written message to the relevant audience if he is not allowed to be present at the entrance to the employer's place of business. Those cases differ only in degree from the sound-amplification, campaign-contribution and littering cases referred to above: They deal with laws which, by prohibiting an essential concomitant of effective speech, infringe upon speech itself, and thus call forth the full First Amendment standard of justification.[9] (It may be difficult to determine what particular conduct beyond the physical presence involved in the marching and picketing cases, or the distribution of literature involved in the littering case, is constitutionally deemed an essential concomitant of effective speech; but I consider it self-evident that on-site sleeping is not.)
 
 
 171
 It is only such cases as Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (flying of a red flag), Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (silent sit-in), United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (burning of a draft card), Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (black arm-bands), and Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (defacing the United States flag), that clearly present situations in which speech--that is, the spoken or written word--is not necessarily involved.[10] The holdings of all these cases support the analysis set forth above. Every proscription of expressive conduct struck down by the Supreme Court was aimed precisely at the communicative effect of the conduct. The only reason to ban the flying of a red flag (Stromberg ) was the revolutionary sentiment that symbol expressed.[11] The only reason for applying the "breach of the peace" statute to the silent presence of black protestors in the library in Brown was the effect which the communicative content of that presence had upon onlookers.[12] The only reason for singling out black armbands for a dress proscription (Tinker ) was precisely their expressive content, allegedly causing classroom disruption.[13] The only reason to prevent the attachment of symbols to the United States flag (Spence ) was related to the communicative content of the flag.[14] In O'Brien, on the other hand, where the Supreme Court upheld a ban on the destruction of draft cards, the law was not directed against the communicative nature of that activity.[15]
 
 
 172
 I do not suggest that the dicta of all the expressive conduct cases, as opposed to their holdings, support the distinction set forth above. Some of the opinions merely label the conduct "expressive" and proceed at once to application of First Amendment standards. Only O'Brien, however, really raises the question (though leaves it unanswered)[16] of what it is that avoids required application of those standards in every case. It is true that O'Brien appears to prescribe an inquiry, identical to that which I have described, as one of the four tests to be applied after it is determined that full First Amendment protections obtain. That would be inconsistent with my analysis if the O'Brien formulation were directed exclusively at "expressive conduct" cases--for a test triggered by the protection could hardly be the very test applied to determine whether the protection exists in the first place. In fact, however, the O'Brien discussion is directed at the tests to be applied in order to validate a statute impinging upon any activity protected by the First Amendment--not just expressive conduct, but also conduct "intertwined with speech," and indeed even religiously motivated or associational conduct.[17] For most of these categories the test would not be duplicative; it is only the governmental restriction of purely expressive conduct that escapes the necessity of First Amendment analysis if it is not aimed at repressing expression. This explanation is confirmed by the Supreme Court's later per curiam opinion in Spence, which, in the context of expressive conduct, describes the inquiry into expression-suppressing purpose--as I have--as a test preliminary to the application of O'Brien's four-step analysis.[18]
 
 
 173
 I find O'Brien supportive of my view since it shows the importance of statutory purpose in the Court's thinking. The distinction here proposed is described explicitly in the following passage:
 
 
 174
 The case at bar is therefore unlike one where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful. In Stromberg v. California, 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117] (1931), for example, this Court struck down a statutory phrase which punished people who expressed their "opposition to organized government" by displaying "any flag, badge, banner, or device." Since the statute there was aimed at suppressing communication it could not be sustained as a regulation of noncommunicative conduct.
 
 
 175
 391 U.S. at 382, 88 S.Ct. at 1681. To the same effect is the following statement in Buckley v. Valeo, 424 U.S. 1, 17, 96 S.Ct. 612, 633, 46 L.Ed.2d 659 (1976):
 
 
 176
 Even if the categorization of the expenditure of money as conduct were accepted, the limitations challenged here would not meet the O'Brien test because the governmental interests advanced in support of the Act involve "suppressing communication." The interests served by the Act include restricting the voices of people and interest groups who have money to spend and reducing the overall scope of federal election campaigns. Although the Act does not focus on the ideas expressed by persons or groups subject to its regulations, it is aimed in part at equalizing the relative ability of all voters to affect electoral outcomes by placing a ceiling on expenditures for political expression by citizens and groups. Unlike O'Brien, where the Selective Service System's administrative interest in the preservation of draft cards was wholly unrelated to their use as a means of communication, it is beyond dispute that the interest in regulating the alleged "conduct" of giving or spending money "arises in some measure because the communication allegedly integral to conduct is itself thought to be harmful." 391 U.S. at 382, 88 S.Ct. at 1681.
 
 
 177
 The effect of the rule I think to be the law may be to permit the prohibition of some expressive conduct that might be desirable. Perhaps symbolic campsites[19] or symbolic fire bases[20] are a good idea. But it is not the function of the Constitution to make such fine judgments; nor is it within the practical power of the courts to apply them. There is a gap between what the Constitution requires and what perfect governance might sometimes suggest, in the area of expression as in other fields. So long as the Park Service is held to even-handed application of its rules, I doubt that the political pressures generated in a representative democracy will tolerate the proscription of all expressive conduct, in Lafayette Park or anywhere else. The Park Service's judgment will not be distorted, however--nor its time and ours consumed--in the mistaken pursuit of a supposed constitutional answer.
 
 
 178
 Where expressive conduct unrelated to speech is at issue, I think it worthwhile to engage in the preliminary step of analysis that separates conduct-prohibiting from expression-prohibiting laws and exempts the former from rigorous First Amendment scrutiny. The government argued in the present case, with some justification, that the posture in which it now finds itself--prohibiting sleep, but permitting all of the external manifestations of sleeping, including tents--is attributable to its efforts to comply with the directives of this court relating to the special justification needed to prohibit expressive conduct. See Women Strike for Peace v. Morton, 472 F.2d 1273 (D.C.Cir.1972). The Park Service has in effect been required to split each of its regulations into two: one that applies to people who are not engaging in the prohibited conduct for an expressive purpose, which can be enforced as written; the other that applies to demonstrators, which can be enforced only if supported by the substantial governmental interest that the First Amendment requires. That necessity may be unavoidable with regard to the relatively narrow range of conduct essential to effective speech. But to expand it to all conduct, even including sleep, seems to me unreasonable and unlikely to work. Park Service officers who have even less assurance of the proper application of the O'Brien four-part test than the various opinions of this court display will (against their sound administrative judgment) permit "symbolic" intrusions that need not be allowed; and the rule for demonstrators will inevitably (and perhaps rightly) tend to become the rule for the public at large--all with needlessly harmful effect upon the agreeability of our parks and public places. The unfortunate result is described by Justice Jackson's statement in Saia v. New York, supra, 334 U.S. at 566, 68 S.Ct. at 1152, which I take the liberty of adapting to the facts of this case: "I dissent from this decision, which seems to me to endanger the great right of free speech by making it ridiculous and obnoxious, more than the Park Service regulation in question menaces free speech by proscribing sleep."
 
 
 
 [1]
 As revised, section 50.27(a) prohibits camping in park areas not designated as public camping grounds, and defines the term as follows:
 Camping is defined as the use of park land for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities. The above listed activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging.
 
 
 [36]
 C.F.R. Sec. 50.27(a) (1982). Section 50.19(e)(8), as amended, prohibits the use of temporary structures for camping outside of designated camping areas. It reads as follows:
 In connection with permitted demonstrations or special events, temporary structures may be erected for the purpose of symbolizing a message or meeting logistical needs such as first aid facilities, lost children areas or the provision of shelter for electrical and other sensitive equipment and displays. Temporary structures may not be used outside designated camping areas for living accommodation activities such as sleeping, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or doing any digging or earth breaking or carrying on cooking activities. The above-listed activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging.
 Id. Sec. 50.19(e)(8).
 
 
 [2]
 Although the veterans' application to demonstrate was filed prior to the effective date of the amended regulations, the Park Service applied the new regulations. See Letter from Park Service to Vietnam Veterans Against the War dated April 22, 1982, reprinted in Record Document (RD) 5
 
 
 [3]
 Despite conflicting evidence in the record as to whether some of the veterans slept all night, it is clear that the Park Service authorized at least some participants in the demonstration to "be asleep in the area at all times during the night." Id
 
 
 [4]
 Section 50.19(e)(8) was promulgated in response to the decision of this court in Women Strike for Peace v. Morton, 472 F.2d 1273 (D.C.Cir.1972) (per curiam). See 47 Fed.Reg. 24,304 (1982). In that case, the court held that Women Strike for Peace, an anti-war organization, could erect a temporary display on the Ellipse. Although the per curiam opinion was followed by three separate statements, the reasoning of the judges was clear: "the Park Service is required to allow the erection of structures by demonstrators to the same extent that it participates in or sponsors the erection of structures itself." Id. at 24,300. The assumption that lies behind this proposition is also clear: "[a structure] is a vehicle for expression of views ... and [to the extent that it acts as such is] entitled to a degree of First Amendment protection." 472 F.2d at 1288 (Wright, J., concurring); see also id. at 1295 (Leventhal, J., concurring) ("Structures on park land, even though temporary, are within the reach of freedom of communications ...."). With our opinion today, we reaffirm the result reached in that decision
 
 
 [5]
 See also CCNV I, 670 F.2d at 1217 n. 26 (confirming this distinction). The motions panel in VVAW was correct in holding that the action taken by the district court "directly contravened the controlling precedent." VVAW, 506 F.2d at 55 n. 6. We refuse, however, to read the precedent as broadly as that panel. The Supreme Court's decision on which that panel grounded its argument, Morton v. Quaker Action Group, 402 U.S. 926, 91 S.Ct. 1398, 28 L.Ed.2d 665 (1971), was issued without an opinion. Absent any supporting reasoning, it should not, and indeed cannot, be cited as precedent for the proposition that sleep can never be protected by the first amendment. The Supreme Court has held consistently that summary disposition extends "only to 'the precise issues presented and necessarily decided by those actions.' " Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 499, 101 S.Ct. 2882, 2888, 69 L.Ed.2d 800 (1981) (quoting Mandel v. Bradley, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (per curiam)). As Chief Judge Bazelon observed in his statement concurring in the denial of rehearing en banc in the VVAW case itself, it is very difficult to ascertain what issues the Supreme Court determined in its 1971 decision. VVAW, 506 F.2d at 61
 
 
 [6]
 Because CCNV's proposed conduct is clearly proscribed by the regulations, CCNV may not claim that those regulations are constitutionally void for vagueness. See, e.g., Parker v. Levy, 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.")
 We also do not find the regulations to be overbroad because the amount of constitutionally protected activity covered by the regulations (assuming arguendo that such activity exists in this case) cannot reasonably be calculated as "substantial." As the Supreme Court stated in Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973), "[w]here conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." The government's ban against sleeping in tents applies to all park areas administered by National Capital Parks in the District of Columbia, Maryland, and Virginia. 36 C.F.R. Sec. 50.1 (1982). Because camping in these areas is primarily for recreation, the chances of the ban directly conflicting with sleeping as an arguable form of expression must be estimated as small. There is certainly no evidence before us today to suggest that any such conflict can be characterized as "substantial."
 
 
 [7]
 See, e.g., Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)
 
 
 [8]
 See, e.g., Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)
 
 
 [9]
 See, e.g., Schneider v. Town of Irvington, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939)
 
 
 [10]
 See, e.g., Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)
 
 
 [11]
 See, e.g., Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)
 
 
 [12]
 See, e.g., Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)
 
 
 [13]
 It is far too late in the day to pretend that the Supreme Court has sanctioned an unwavering first amendment line between speech and conduct. Such a view cannot be squared with either the holdings of those cases extending first amendment protection to a wide range of physical activities, see supra cases cited in notes 7-12, or with the Court's occasional statements on the matter. E.g., Brown v. Louisiana, 383 U.S. 131, 141-42, 86 S.Ct. 719, 723-724, 15 L.Ed.2d 637 (1966) (plurality), cited in Tinker v. Des Moines School District, 393 U.S. 503, 505, 89 S.Ct. 733, 735, 21 L.Ed.2d 731 (1969) ("[First amendment] rights are not confined to verbal expression. They embrace appropriate types of action which certainly include the right in a peaceable and orderly manner to protest by silent and reproachful presence ...."); see also Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 HARV.L.REV. 1482, 1495 (1975) ("The O'Brien Court thus quite wisely dropped the 'speech-conduct' distinction as quickly as it had picked it up.")
 The theoretical objections to a speech-conduct distinction have been noted by several commentators. See, e.g., Baker, Scope of the First Amendment Freedom of Speech, 25 U.C.L.A.L.REV. 964, 1010 (1978) ("If the distinction is between 'expressing' and 'doing,' most conduct falls into both categories."); Ely, supra, at 1495 ("Attempts to determine which element 'predominates' will ... inevitably degenerate into question-begging judgments about whether the activity should be protected."); Henkin, The Supreme Court, 1967 Term--Foreword: On Drawing Lines, 82 HARV.L.REV. 63, 79 (1968) ("Even singular, idiosyncratic forms of expression can prove no less articulate, as when Simeon spent his days sitting on a pillar in the desert or the King of Denmark wore a six-pointed star."); Note, Symbolic Conduct, 68 COLUM.L.REV. 1091, 1108 (1968) ("Recent work in communications theory underlines the connection between free choice of the medium of communication and freedom of expression."). Even Professor Emerson, a leading proponent of the speech-action distinction, acknowledges that "the clearest manifestation of expression involve[s] some action, as in the case of holding a meeting, publishing a newspaper, or merely talking." T. EMERSON, THE SYSTEM OF FREEDOM OF EXPRESSION 80 (1970).
 
 
 [14]
 See Photographs of 1981-82 CCNV demonstration dated February 22, 1982, reprinted in RD 17; Declaration of Gabrial Leanza, p 7, reprinted in RD 19
 
 
 [15]
 See Second Declaration of Mitch Snyder, p 5, reprinted in RD 15; Declaration of Gabrial Leanza, p 8, reprinted in RD 19
 
 
 [16]
 Although CCNV clearly evidences in its permit application an intent to express a message through the protestors' sleeping, it also documents a very functional view of sleeping: that sleeping opportunities are vital to its demonstration in order to make it possible for the homeless to attend. See CCNV application to demonstrate filed September 7, 1982, reprinted in RD 1, at 2. The government contended at oral argument that CCNV had thus belied any true intent to communicate a message through the participants' sleeping. But we do not find the government's argument to be so conclusive. To the extent that we are assessing CCNV's intent, and not its skill in drafting documents, we cannot close our eyes to the fact that CCNV's application indicates that sleeping will serve both an expressive and functional purpose. Moreover, we note that CCNV need not prove the intent of its demonstrators by any sort of preponderance of evidence. As we indicate in note 31 infra, demonstrators should be held to no higher standard than the advancement of a plausible contention that their conduct is intended to, and in the context of their demonstration likely will, express a message. In this case, such a plausible contention is supplied by CCNV's intent to model this year's demonstration after last year's. Despite what must surely have been the same sociological realities of the homeless last year, the CCNV I court found that sleeping in the tents in the winter of 1981-82 sent an unmistakable message. 670 F.2d at 1217
 
 
 [17]
 Although the CCNV I court did not decide the constitutional issue, it is unclear how last year's sleeping could have been sufficiently expressive for the purpose of satisfying the Park Service's old policy criterion ("use of symbolic campsites reasonably related to First Amendment activities," 46 Fed.Reg. 55,959, 55,961 (1981)), but remain insufficiently expressive to fall within the first amendment this year. As CCNV indicates in its 1982 application, the demonstration planned for this year is modeled after last year's demonstration. See CCNV application to demonstrate filed September 7, 1982, reprinted in RD 1, at 2
 
 
 [18]
 Appellants' Reply to Opposition to Appellants' Emergency Motion for Injunction Pending Appeal and Opposition to Appellants' Motion for Summary Affirmance 20
 
 
 [19]
 Appellants' Reply, supra note 18, at 12-13
 
 
 [20]
 Indeed, as Professor Tribe indicates, there is an identifiable interest in according unorthodox modes of expression first amendment protection:
 If only orthodox modes of expression were protected, "the old saw that familiarity breeds contempt," ... might mean that truly effective communication would be left undefended by the first amendment. Moreover, ... laws which leave unorthodox media defenseless in effect favor orthodox messages ....
 L. TRIBE, AMERICAN CONSTITUTIONAL LAW Sec. 12-20, at 685 n. 12, (quoting Ely, supra note 13, at 1489) (emphasis in original).
 
 
 [21]
 "The basic issue in all such cases is how much the First Amendment requires society to give up in the interest of communication--that is, what price we are willing to put on free speech." Women Strike for Peace v. Morton, 472 F.2d 1273, 1284 (D.C.Cir.1972) (Wright, J., concurring)
 
 
 [22]
 The metaphor of placing a judicial thumb on the first amendment side of the scales may be attributed to the genius of Professor Harry Kalven. See Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 SUP.CT.REV. 1, 28
 
 
 [23]
 Appellees' Response in Opposition to Appellants' Emergency Motion for Injunction Pending Appeal 8-9
 
 
 [24]
 See CCNV application to demonstrate filed September 7, 1982, reprinted in RD 1, at 2
 
 
 [25]
 See Letter from Mitch Snyder to Park Service dated March 5, 1982, reprinted in RD 19, at 1
 
 
 [26]
 See CCNV application to demonstrate filed September 7, 1982, reprinted in RD 1, at 2
 
 
 [27]
 CCNV has never maintained that it needs or desires to use cots in these symbolic campsites. See December 5th Declaration of Mitch Snyder, p 5, reprinted in RD 21. We note that CCNV used bedding materials (blankets) last year and that it is quite likely that it will do so again. This use of bedding is one of the indicia the Park Service employs to determine if "camping" is taking place. See 36 C.F.R. Secs. 50.19(e)(8), 50.27(a) (1982). We hold, however, that in the context of sleeping in tents, the government has no discernible reason to prohibit such bedding; bedding in a tent requires no additional ground space, is out of view, and has no connection to any of the other interests asserted by the government in this case--sanitation facilities, law enforcement personnel, or living accommodation subsidies
 
 
 [28]
 It has been suggested by some that the Supreme Court in Heffron v. International Soc. for Krishna Consciousness, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), signaled a departure from the less restrictive means test of O'Brien. See Note, 61 NEB.L.REV. 167, 182-86 (1982). Compare Tacynec v. City of Philadelphia, 687 F.2d 793, 797-98 (3d Cir.1982) with New York City Unemployed and Welfare Council v. Brezenoff, 677 F.2d 232, 237 (2d Cir.1982). We find, however, that the majority in Heffron did apply the test to the regulation of ISKCON's activities. See 452 U.S. at 654, 101 S.Ct. at 2567. The Court examined the alternatives put forward by ISKCON--penalizing disorder, limiting the number of people authorized to conduct the activity, restricting the activity to certain locations within the forum--and concluded that "it is quite improbable that the alternative means ... would deal adequately with the problems posed ...." Id. Such is not the case here; the alternative put forward in Heffron itself, for instance, would better serve the Park Service's interests than a total ban on sleep and would be less restrictive of the first amendment activity proposed. See infra notes 29 & 32
 
 
 [29]
 In addition, we note that the Park Service surely has the ability to police demonstrations against the expansion of activities such as cooking, making fires, etc. Indeed, many pages of the government's brief are taken up with illustrations of how it has enforced the sleeping ban against other groups since the new regulations came into effect. Appellees' Response, supra note 23, at 10-13. It would appear that the Park Service could simply shift its personnel from nighttime sleep patrols to policing against these other activities, thereby assuring the protection of parkland at little, if any, additional expense
 
 
 [30]
 Such a fear would be truly undifferentiated because any increase in requests for living accommodations by nondemonstrators simply could be refused by the Park Service. Accordingly, this wholly insubstantial fear of "requests" is of far less significance than the real possibility in Heffron that a significant influx of people with a valid right of access to a state fair would flood the walkways of an already crowded fairgrounds with leafletters and solicitors. 452 U.S. at 652-53, 101 S.Ct. at 2566-2567
 
 
 [31]
 We reiterate that the Park Service is not allowed to decide whether it sees a sufficient relationship between the message of the would-be demonstrators and their asserted expressive interest in sleeping. See supra text at 593. Instead, it need only determine whether the demonstrators seek to sleep for expressive purposes, as opposed to sleep for mere convenience or recreation. We note that the Park Service already makes this same determination in evaluating requests for temporary structures "for the purpose of symbolizing a message." 36 C.F.R. Sec. 50.19(e)(8) (1982). Accordingly, we do not expect the Park Service to become enmeshed in any in-depth probe of the requesters' ulterior motives. Rather, we expect that all plausible requests will be accepted at face value and processed by the Park Service with the same degree of respect and efficiency that the Park Service has processed demonstrators' requests for temporary symbolic structures. And, we add, that any permits for symbolic sleeping which are abused by demonstrators may, as always, be rescinded
 
 
 [32]
 The dissent inexplicably assumes that the only less restrictive means for furthering the government's interests in park management is to discriminate among applicants for "camping" permits on the basis of subject matter or content--something that neither we, nor the dissent, countenance as a legitimate governmental option. Whatever the dissent's purpose in knocking down this straw man, it nowhere else discusses the obvious alternative of revoking a demonstration's permit should its participants engage in non-sleep "camping" activities. See supra note 29. Indeed, unlike the situation in Heffron where the Court found that alternative means for crowd control could not deal adequately with the potentially large numbers of state fair solicitors, 452 U.S. at 654, 101 S.Ct. at 2567, both the government and the dissent have underscored the potential effectiveness of permit revocation as a means of enforcing the Park Service's anti-camping regulations in Lafayette Park and on the Mall:
 Furthermore, in the one case where the Park Service detected a violation of the regulations, it demanded compliance and the next day, after similar violations occurred, revoked the demonstration permit for non-compliance with the regulations and conditions of the permit. A standard of reasonable, even-handed enforcement calls for no more.
 Dissenting Opinion at 611; see also Appellees' Response, supra note 23, at 10-13.
 
 
 [33]
 See Women Strike for Peace, 472 F.2d at 1290 ("It would be permissible, for example, ... to regulate the size or aesthetic character of displays built on park land.") (Wright, J., concurring)
 
 
 [34]
 We note that both CCNV and the government indicated some flexibility at oral argument as to the overall number of demonstrators. While we do not hold that CCNV, or any group, has a right to as many round-the-clock protestors as it likes, we also require that the Park Service, in setting any limitations, do so with an eye to the first amendment values which we have identified in this opinion
 
 
 [35]
 In Washington Free Community, Inc. v. Wilson, 334 F.Supp. 77 (D.D.C.1971), the court held that the governmental interest in protecting the serenity of such places as the Lincoln and Jefferson Memorials may be greater than its interest in promoting the serenity of such busy places as Dupont Circle, Farragut Square, or Lafayette Park. Id. at 82. Without expressing any views on the precise calculus of interests as to any one area, we note that the Memorial Core area in Washington, D.C. is comprised of discrete, and often quite different, parts. Although we think that the public's interest in expressing its views are particularly strong on the Mall and in Lafayette Park, see supra text at 593, the Park Service need not treat the Memorial Core area as a monolithic whole
 
 
 [36]
 In his separate dissenting statement, Judge Scalia attempts to extract a simple rule from a complex web of cases. His efforts are confounded for at least two reasons. First, to determine if conduct is sufficiently expressive to implicate first amendment scrutiny, the Supreme Court has instructed us to look to the context in which the conduct takes place and the intent with which it is carried out. Spence v. Washington, 418 U.S. at 410-11, 94 S.Ct. at 2730-31. It is not possible to resolve the question merely by stating, as does Judge Scalia, that "[i]t is difficult to conceive of any activity inherently less expressive than the act (if it may be called that) of sleep." The same judgment could also be made about the act of sitting down in Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (the library sit-in case), and only proves Professor Ely's warning that such intuitive conclusions "inevitably degenerate into question-begging judgments about whether the activity should be protected," see Ely, supra note 13, at 1495. Second, Judge Scalia collapses the four-pronged O'Brien test into a one-pronged standard. But in O'Brien the Supreme Court was analyzing a law that it found not to have been directed against the communicative nature of draft card burning and still felt it necessary to consider the extent to which substantial governmental interests were furthered and the possibility of using less restrictive means. The fact that the Spence Court invalidated the application of a statute which was directed against the communicative nature of flag displays, without reaching the O'Brien test, hardly suggests that O'Brien was, sub silentio, overturned. Judge Scalia's attempt to restrict O'Brien to "speech-plus" cases not only overlooks the wholly nonverbal conduct for which O'Brien was convicted but also the values underlying the first amendment. To suggest that individuals can be punished for expressive nonverbal conduct because they violate a "neutral" law--regardless of whether the application of that law to them is necessary to further an important governmental interest--puts a premium on spoken or written "speech" that has no bearing on the values of self-expression and contribution to the marketplace of ideas that give the first amendment meaning. Judge Scalia's preoccupation with these types of "speech" ignores the fact that the first amendment's values may be furthered by nonverbal, as well as verbal, expression
 
 
 [1]
 Judge Wilkey correctly acknowledges that the alleged "camping" in this case "is limited to such activities as erecting tents or other structures, laying out blankets, sleeping bags, and other bedding materials, and sleeping." "[C]ooking, building fires, and digging latrines" are not called into question in this case because the appellants do not seek to engage in such activities. Indeed, the only matter in dispute is sleeping; the Park Service has not sought to bar the appellants from erecting tents, laying out blankets or bedding, or even from maintaining a 24-hour presence
 
 
 [2]
 In this case--because the appellants do not seek to engage in certain "camping" activity and because the Park Service does not seek to prohibit all forms of "camping" activity (see note 1 supra )--sleeping and not full-scale camping is the only issue in dispute. Thus, the reference to a total ban here pertains solely to sleeping
 
 
 [3]
 I find no reason to decide whether "sleeping" is, as Judge Wilkey says, the appellants' "most effective mode of expression." This is at best an arguable assertion and surely wholly irrelevant to our inquiry in this case
 
 
 [1]
 Mikva Opinion at 587-596
 
 
 [2]
 Judge Mikva effectively describes CCNV's position: homeless people who sleep as part of their round-the-clock protest against official neglect convey a message at least as intelligibly as many marchers under banners or speakers from soap boxes convey points of view; the CCNV demonstrators show by their presence, awake and sleeping, that they have nowhere to live. However, Judge Mikva rejects the terminal point of CCNV's argument: the homeless speak when they sleep, CCNV maintains, the nonhomeless generally do not; because the homeless are different from demonstrators for whom sleep facilitates, but does not also or as clearly embody expression, decision of CCNV's appeal is appropriately tied to their special case. Judge Mikva declines to rest his decision on this ground "because it would require the government to draw distinctions ... depending on the subject matter or content of [a group's] message, and its alleged relationship to sleep, something the first amendment is designed to prevent." Id. at 594. Most members of the court concur in that view. See Dissenting Opinion of Judge Wilkey at 612 [hereinafter referred to as Wilkey Opinion]. Judge Mikva therefore proceeds, as Judge Wilkey observes, id., from a determination that sleeping is indeed expressive in CCNV's case to the conclusion that sleeping must be allowed to "all those who wish to engage in [it] as part of their demonstration and have been granted renewable permits to demonstrate on a twenty-four hour basis on sites at which they have also been allowed to erect temporary symbolic structures." Mikva Opinion at 596. The passage from the initial determination that CCNV's sleep is expression to the conclusion that all round-the-clock demonstrators with tents may sleep in them is not a smooth one
 
 
 [3]
 Edwards Opinion at 600
 
 
 [4]
 But see Nimmer, Symbolic Speech, 21 U.C.L.A.L.REV. 29, 33-34 (1973):
 It might be argued that "speech" within the meaning of the first amendment should encompass only those particular expressions in which the symbols employed consist of conventional words.... Most would agree that it is the freedom to express ideas and feelings, not merely the freedom to engage in verbal locutions, which constitutes the core meaning of the first amendment. Holmes' "free trade in ideas" may not be reduced to mere trade in words. It is the ideas expressed, and not just a particular form of expression, that must be protected if the underlying first amendment values are to be realized.
 (Emphasis in original; footnotes omitted.).
 
 
 [5]
 See particularly Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 SUP.CT.REV. 1; HENKIN, The Supreme Court, 1967 Term--Foreword: On Drawing Lines, 82 HARV.L.REV. 63, 76-82 (1968)
 
 
 [6]
 Wilkey Opinion at nn. 33 & 34 and accompanying text; cf. Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 HARV.L.REV. 1482, 1488-89 (1975)
 
 
 [7]
 See Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969) (students wearing black armbands to publicize their objections to the Vietnam war were involved in the exercise of "direct, primary First Amendment rights akin to 'pure speech' "); cf. Garner v. Louisiana, 368 U.S. 157, 201, 82 S.Ct. 248, 271, 7 L.Ed.2d 207 (1961) (Harlan, J., concurring in the judgment) (lunch counter sit-in to protest segregation "is as much a part of the 'free trade in ideas,' ... as is verbal expression")
 
 
 [8]
 See generally Henkin, supra note 5, at 76-82
 
 
 [9]
 Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), holding unconstitutional a California prohibition on displaying a red flag as a means of political expression, was among the early cases acknowledging that "speech" may be nonverbal. Nine years later, the Court declared peaceful picketing to publicize a labor dispute constitutionally protected free speech. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). The Court has not been consistent in its descriptions of protest marches as a form of "speech." Compare Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963) (march to State House reflected "an exercise of ... basic constitutional rights in their most pristine and classic form"), with Cox v. Louisiana, 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965) (picketing and parading described as "conduct mixed with speech"). See generally Kalven, supra note 5
 
 
 [10]
 Cf. Ely, supra note 6, at 1495
 CCNV, in its permit request, acknowledged a non-communicative, "living accommodation" facet of the sleeping it proposed. Referring to CCNV's experience the preceding year, the request stated: "[A]bsent a survival-related reason for being in Lafayette Park--something such as a meal or the chance to sleep in relative warmth--they [the homeless] did not and would not come." Appellants' Complaint, Exhibit A at 3.
 
 
 [11]
 The Court said of the flag display at issue in Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), intended to protest the invasion of Cambodia and the killings at Kent State University: "[I]t would have been difficult for the great majority of citizens to miss the drift of [Spence's] point at the time that he made it." Id. at 410, 94 S.Ct. at 2730. The sleeping demonstrators' message may be less quickly perceived. Passersby might observe: (1) they are certainly sleeping; (2) they may be doing so to facilitate their participation in the protest; (3) in addition to facilitating their expression, they may be sleeping as an expressive part of their protest. Sleeping, in other words, is not as securely or unambiguously seen, as is wearing an armband, displaying a flag, or marching, as a "common comprehensible form of expression." See Henkin, supra note 5, at 80
 
 
 [12]
 See Kalven, supra note 5, at 12, 23, 26-27 (labeling a public address or a pamphlet "speech pure" and a protest march "speech plus" lacks an "intelligible rationale")
 Supreme Court opinions have described picketing and litigation, inter alia, as "speech plus." See Brandenburg v. Ohio, 395 U.S. 444, 455, 89 S.Ct. 1827, 1833, 23 L.Ed.2d 430 (1969) (Douglas, J., concurring) ("Picketing ... is 'free speech plus.' ... That means it can be regulated when it comes to the 'plus' or 'action' side of the protest."); Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 326, 88 S.Ct. 1601, 1612, 20 L.Ed.2d 603 (1968) (Douglas, J., concurring) ("Picketing is free speech plus, the plus being physical activity that may implicate traffic and related matters.") (emphasis in original); Communist Party v. Subversive Activities Control Bd., 367 U.S. 1, 173, 81 S.Ct. 1357, 1450, 6 L.Ed.2d 625 (1961) (Douglas, J., dissenting) (picketing); NAACP v. Button, 371 U.S. 415, 455, 83 S.Ct. 328, 349, 9 L.Ed.2d 405 (1963) (Harlan, J., dissenting) ("[L]itigation, whether or not associated with the attempt to vindicate constitutional rights, is conduct; it is speech plus.") (emphasis in original). But cf. Kalven, supra, at 23 ("[A]ll speech is necessarily 'speech plus.' If it is oral, it is noise and may interrupt someone else; if it is written, it may be litter.").
 I use the term "speech plus" here not to describe expressive activity "with collateral consequences that invite[ ] regulation," Kalven, supra, at 23, but to refer to conduct designed both to speak and to accomplish a more readily or commonly comprehended non-communicative purpose.
 
 
 [13]
 See Kalven, supra note 5, at 12 ("[G]enerosity and empathy with which [the] facilities [of a public forum] are made available is an index of freedom.... [W]hat is required is in effect a set of Robert's Rules of Order for the new uses of the public forum, albeit the designing of such rules poses a problem of formidable practical difficulty.")
 
 
 [14]
 Judge Mikva observes that the Park Service may "limit the number of tents, the size of tents or campsites, and the number of persons allowed to sleep." It may "set aside certain times when no demonstrations are allowed," and, "possibly, it may be able to set aside some ... areas ... at which round-the-clock demonstrations are never compatible." Mikva Opinion at 599. Judge Edwards adds that "[g]overnment officials also may limit or prevent the storage of personal belongings, and perhaps prevent any individual from sleeping in the parks beyond a specified, successive number of hours or days." Edwards Opinion at 604. Judge Wilkey gives way to hyperbole when he suggests that these opinions exclude reasonable time, place, and manner regulation and would permit demonstrators to engage in any activity they believe "will facilitate or improve the [demonstration]." See Wilkey Opinion at 613
 
 
 [15]
 Wilkey Opinion at 613
 
 
 [1]
 See 47 Fed.Reg. 24,299-306 (1982) (to be codified at 36 C.F.R. Secs. 50.19, 50.27). Set out at pp. 617-618, infra
 
 
 [2]
 The district court delivered its judgment orally on 3 December 1982. Written Findings of Fact and Conclusions of Law followed on 9 December
 
 
 [3]
 Community for Creative Non-Violence v. Watt, Nos. 82-2445 and 82-2477 (D.C.Cir. 20 Dec. 1982)
 
 
 [4]
 See 47 Fed.Reg. 24,299-306 (1982)
 
 
 [5]
 Community for Creative Non-Violence v. Watt, 670 F.2d 1213 (1982)
 
 
 [6]
 Id. at 1217
 
 
 [7]
 47 Fed.Reg. at 24,299-306
 
 
 [8]
 Id. at 24,305
 
 
 [9]
 Id. at 24,302
 
 
 [10]
 See Reply to Appellees' Opposition to Appellants' Emergency Motion for Injunction Pending Appeal and Opposition to Appellants' Motion for Summary Affirmance (Appellants' Reply Brief) at 3, 8-9
 
 
 [11]
 Village of Hoffman Estates v. Flipside, Hoffman Estates Inc., 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1971)
 
 
 [12]
 This court has already concluded that a regulation prohibiting camping, defined in terms very similar to the current regulations, was not unconstitutionally vague. See Vietnam Veterans Against the War v. Morton, 506 F.2d 53, 59 (D.C.Cir.1974)
 
 
 [13]
 See Part III, infra
 
 
 [14]
 Broadrick v. Oklahoma, 413 U.S. 601, 613-15, 93 S.Ct. 2908, 2916-2917, 37 L.Ed.2d 830 (1973)
 
 
 [15]
 Id. at 615, 93 S.Ct. at 2917
 
 
 [16]
 Findings of Fact and Conclusions of Law at 7
 
 
 [17]
 See Appellants' Reply Brief at 44-51
 
 
 [18]
 See, e.g., Bishop v. Wood, 426 U.S. 341, 347, 96 S.Ct. 2074, 2078, 48 L.Ed.2d 684 (1976); Abraham v. Graphic Arts Intern. Union, 660 F.2d 811, 814-15 (D.C.Cir.1981)
 
 
 [19]
 For example, appellants cite the 1968 "Resurrection City" demonstration and the 1979 "Farmers March." A Vietnam Veterans Against the WAR (VVAW) demonstration in early May relied on by appellants also took place prior to the effective date of the amended regulations. However, the Park Service applied the new regulations to that demonstration, yet still authorized at least some participants in the demonstration to "be asleep in the area at all times during the night." Letter from Park Service to VVAW dated 22 April 1982, reprinted in Record Document (RD) 5. In that case, however, the sleeping was incidental to an all-night vigil at a mock Vietnam War-era "firebase" at which the demonstrators took turns standing symbolic "guard duty." Since no tents or other structures were used by the VVAW, the Park Service determined that the demonstration did not constitute "camping" within the meaning of the new regulations
 
 
 [20]
 See Letter from Park Service to Assoc. of Community Organizations for Reform Now dated 18 June 1982; Letter from Park Service to Palestine Congress of North America dated 8 September 1982; Letter from Park Service to Arab Women's Council dated 28 July 1982, all reprinted in RD 5
 
 
 [21]
 Findings of Fact and Conclusions of Law at 8
 
 
 [22]
 See Appellants' Reply Brief at 54
 
 
 [23]
 Findings of Fact and Conclusions of Law at 20-21
 
 
 [24]
 United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968)
 
 
 [25]
 Id
 
 
 [26]
 Mikva Op. at 591-594
 
 
 [27]
 Id. at 593
 
 
 [28]
 Id. at 592
 
 
 [29]
 Id. at 594
 
 
 [30]
 See id. at n. 16 ("demonstrators should be held to no higher standard than the advancement of a plausible contention that their conduct is intended to, and in the context of their demonstration likely will, express a message")
 
 
 [31]
 Id. at 594
 
 
 [32]
 Id. ("whatever the particular form of the protestors' presence at night, their presence itself implicates the first amendment")
 
 
 [33]
 See, e.g., Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam); Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)
 
 
 [34]
 It may well always be true that conduct which should not in the first place have been accorded full First Amendment "speech" protection will, even assuming such protection, readily be proscribable under the O'Brien test. Applying this test on a case-by-case basis does, however, impose a considerable burden upon administrators and the courts, and may produce erroneous judgment which (so long as they are not adverse to demonstrators) are not appealable to the courts. We do not, therefore, deprecate the value of the more direct approach which both the O'Brien court and we have avoided; but in the absence of further clarification from the Supreme Court we take the safer course for the present
 
 
 [35]
 391 U.S. at 377, 88 S.Ct. at 1679
 
 
 [36]
 See p. 614, infra
 
 
 [37]
 See Schneider v. New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Ely, Flag Desecration: A Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 HARV.L.REV. 1482, 1486-87 (1975)
 
 
 [38]
 See Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949)
 
 
 [39]
 See Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam)
 
 
 [40]
 See Cohen v. California, 403 U.S. 15, 21-22, 91 S.Ct. 1780, 1786-1787, 29 L.Ed.2d 284 (1971)
 
 
 [41]
 See, e.g., Paris Adult Theater I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (obscenity); Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam) (advocacy of imminent lawless action); Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (fighting words)
 
 
 [42]
 See Ely, supra note 37, at 1482-90; Farber, Content Regulation and the First Amendment: A Revisionist View, 68 GEO.L.J. 727, 742 n. 83 (1980)
 
 
 [43]
 The absurdities to which an alternative approach could lead are readily apparent. The government could make any regulation invincible by tacking on a prohibition that is undoubtedly supported by a substantial interest but has nothing to do with the usual application of the regulation, such as "Camping and the detonation of hand grenades is forbidden in the parks of the Memorial core area."
 
 
 [44]
 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)
 
 
 [45]
 Id. at 651-52, 101 S.Ct. at 2566-2567
 
 
 [46]
 Id. at 652-53, 101 S.Ct. at 2566-2568
 
 
 [47]
 Id. at 652, 101 S.Ct. at 2566
 
 
 [48]
 391 U.S. at 378-82, 88 S.Ct. at 1679-1681
 
 
 [49]
 Judge Edwards suggests that "the only matter in dispute is sleeping," since "the Park Service has not sought to ban the appellants from erecting tents, laying out blankets or bedding, or even maintaining a 24-hour presence." Edwards Op. at n. 1. See also id. at 603. We think this is an unduly narrow characterization of what is at stake in this case. The regulations permit a round-the-clock presence and the erection of symbolic structures, including tents, for demonstration purposes. They do not permit a 24-hour presence or the erection of any structures for purposes of living accommodation. As we explain below, see Section III(B)(3), the only way the Park Service can maintain this distinction is by refusing to allow demonstrators to sleep in addition to their other activities. It is sleep that would provide the incentive for nondemonstrators and, perhaps, many demonstrators to erect structures and remain through the night. Unused tents and a nighttime vigil will only be employed for purposes of expression. If the convenience of sleep were added, the Park Service would be unable to distinguish between the symbolic and non-symbolic use of structures and nighttime vigils. Thus, the broader regulatory scheme, which forbids nondemonstrators to erect structures and remain round-the-clock as well as forbids all persons to sleep, is at stake in this case. We will, therefore, continue to speak of "camping," and not merely "sleeping."
 
 
 [50]
 47 Fed.Reg. at 24,301
 
 
 [51]
 Findings of Fact and Conclusions of Law at 6
 
 
 [52]
 See, e.g., United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)
 
 
 [53]
 See, e.g., Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)
 
 
 [54]
 Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam)
 
 
 [55]
 However, as we shall see, pp. 620-622, it would be impossible to fashion "narrow, objective, and definite" standards that would limit permission to camp to those few cases where camping is expressive
 
 
 [56]
 Letter from CCNV to Park Service (undated), reprinted in RD 5
 
 
 [57]
 Appellants' Emergency Motion for Injunction Pending Appeal at 21-22; Appellants' Reply Brief at 6-7
 
 
 [58]
 See Appellants' Emergency Motion for Injunction Pending Appeal at 21-22; Appellants' Reply Brief at 6-7
 
 
 [59]
 See, e.g., Heffron v. Int'l Soc. for Krishna Consc., 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981); Adderly v. Florida, 385 U.S. 39, 47-48, 87 S.Ct. 242, 247-248, 17 L.Ed.2d 149 (1966); Lloyd Corp. v. Tanner, 407 U.S. 551, 567, 92 S.Ct. 2219, 2228, 33 L.Ed.2d 131 (1972)
 
 
 [60]
 What the litigant's press agent seeks and what the public interest requires differ widely. Although every man is entitled to make his remonstrance, no man is entitled to make such a remonstrance that it will be carried on all three television networks
 Vietnam Veterans Against the War v. Morton, 506 F.2d 53, 58 (D.C.Cir.1974).
 
 
 [61]
 Edwards op. at 602-603
 
 
 [62]
 Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939) (Roberts, J., concurring)
 
 
 [63]
 See, e.g., Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965)
 
 
 [64]
 See, e.g., Adderly v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966)
 
 
 [65]
 See, e.g., Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972)
 
 
 [66]
 See, e.g., Schneider v. New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939)
 
 
 [67]
 See, e.g., Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948)
 
 
 [68]
 Hague v. CIO, 307 U.S. at 516, 59 S.Ct. at 964
 
 
 [69]
 Appellants' Reply Brief at 63
 
 
 [70]
 A. FRANCE, LE LYS ROUGE (1894) ch. 7
 
 
 [71]
 Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-153, 89 S.Ct. 935, 938-940, 22 L.Ed.2d 162 (1969); Niemotko v. Maryland, 340 U.S. 268, 271-72, 71 S.Ct. 325, 327-328, 95 L.Ed. 267 (1951); Kunz v. New York, 340 U.S. 290, 294, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951); Lovell v. Griffin, 303 U.S. 444, 450-51, 58 S.Ct. 666, 668-669, 82 L.Ed. 949 (1938)
 
 
 [72]
 Shuttlesworth v. City of Birmingham, 394 U.S. at 151, 89 S.Ct. at 938
 
 
 [73]
 Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). See also Carey v. Brown, 447 U.S. 455, 466-67, 100 S.Ct. 2286, 2293-2294, 65 L.Ed.2d 263 (1980)
 
 
 [74]
 Judge Mikva chides us for ignoring the "obvious alternative of revoking a demonstration's permit should its participants engage in non-sleep 'camping' activities." Mikva Op. at n. 32. It is not clear what he means by this, however, in light of his earlier acknowledgement that the activities proposed by appellants themselves constitute "camping" within the meaning of the new regulations. See id. at 591. His meaning is further confounded by a citation from our opinion which he says "underscore[s] the potential effectiveness of permit revocation as a means of enforcing the Park Service's anti-camping regulations ...." Id. at n. 32. It is precisely those regulations which Judge Mikva's opinion disables. If they can't be used to deny a permit for "First Amendment camping" (a category, we have explained, that cannot be given viable boundaries), then surely they can't be used to revoke a permit for that same camping
 
 
 [1]
 For a description of those requirements, see, e.g., City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976)
 
 
 [2]
 I refer here only to the First Amendment's guarantees of freedom of speech and press--not to other guarantees, such as freedom of religion or the right of personal autonomy or privacy which some cases have rested in part upon the First Amendment. See, e.g., Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); Griswold v. Connecticut, 381 U.S. 479, 482-83, 85 S.Ct. 1678, 1680-1681, 14 L.Ed.2d 510 (1965)
 
 
 [3]
 See Saia v. New York, 334 U.S. 558, 561, 68 S.Ct. 1148, 1150, 92 L.Ed. 1574 (1948) ("Loudspeakers are today indispensable instruments of effective public speech")
 
 
 [4]
 See Buckley v. Valeo, 424 U.S. 1, 16, 96 S.Ct. 612, 633, 46 L.Ed.2d 659 (1976):
 We cannot share the view that the present Act's contribution and expenditure limitations are comparable to the restrictions on conduct upheld in O'Brien. The expenditure of money simply cannot be equated with such conduct as destruction of a draft card. Some forms of communication made possible by the giving and spending of money involve speech alone, some involve conduct primarily, and some involve a combination of the two. Yet this Court has never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a nonspeech element or to reduce the exacting scrutiny required by the First Amendment.
 
 
 [5]
 See Schneider v. State, 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939):
 It is argued that the circumstance that in the actual enforcement of the Milwaukee ordinance the distributor is arrested only if those who receive the literature throw it in the streets, renders it valid. But, even as thus construed, the ordinance cannot be enforced without unconstitutionally abridging the liberty of free speech. As we have pointed out, the public convenience in respect of cleanliness of the streets does not justify an exertion of the police power which invades the free communication of information and opinion secured by the Constitution.
 
 
 [6]
 See American Radio Ass'n v. Mobile Steamship Ass'n, 419 U.S. 215, 231, 95 S.Ct. 409, 418, 42 L.Ed.2d 911 (1974); W. LOCKHART, Y. KAMISAR, & J. CHOPER, CONSTITUTIONAL LAW 1136 (1980)
 
 
 [7]
 See, e.g., Cameron v. Johnson, 390 U.S. 611, 617, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968); Cox v. Louisiana, 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965)
 
 
 [8]
 See, e.g., Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 313, 88 S.Ct. 1601, 1605, 20 L.Ed.2d 603 (1968)
 
 
 [9]
 These cases would be compatible with the analysis I have set forth, even if they were to be regarded as involving not "speech-plus" but purely nonspeech expressive conduct. The picketing cases, for example, do not invalidate general prohibitions against walking back and forth, or against obstructing entrances, but rather banning such activities when engaged in for the (expressive) purpose of inducing people to refrain from trading or working. See, e.g., Thornhill v. Alabama, 310 U.S. 88, 91-92 [60 S.Ct. 736, 738-739, 84 L.Ed. 1093] (1940), where the statute forbade "[a]ny person ... [to] go near to or loiter about the premises or place of business of any other person ... for the purpose, or with the intent of influencing, or inducing other persons not to trade with, buy from, sell to, have business dealings with, or be employed by such persons ...." See also Carlson v. California, 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed. 1104] (1940). The marching cases typically turn upon the use of a vague ordinance for the very purpose of suppressing only expressive activity. See, e.g., Shuttlesworth v. City of Birmingham, 394 U.S. 147, 153, 89 S.Ct. 935, 940, 22 L.Ed.2d 162 (1969); Edwards v. South Carolina, 372 U.S. 229, 236, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963)
 
 
 [10]
 In my view, the nude entertainment holdings do not deal with mere expressive conduct. Schad v. Borough of Mount Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), struck down the challenged ordinance on overbreadth grounds, since it included all live entertainment--including spoken entertainment. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), involved a prohibition not of nudity alone, but of the entire stage production "Hair" because it included nudity. It stands for the well-established principle that a spoken or written work which has "serious artistic value" cannot be banned simply because it includes matter which, in isolation, might be proscribable. In California v. LaRue, 409 U.S. 109, 118, 93 S.Ct. 390, 397, 34 L.Ed.2d 342 (1972), the Court said that "at least some of the performances" covered by the regulation banning nudity and sexual acts "are within the limits of the constitutional protection of freedom of expression" (the case in any event upheld the regulation); and in Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975), it said that the nude barroom dancing might be protected "under some circumstances." Both these cases may have had in mind only nudity in connection with a spoken or sung performance. In any case, I find it difficult to believe that exhibitory nudity will, on the ground that it is independently "communicative," be accorded greater constitutional protection than the nondemonstrative sort, such as nude bathing, see, e.g., Chapin v. Town of Southampton, 457 F.Supp. 1170 (E.D.N.Y.1978). In other words, to the extent the nude entertainment cases speak to nudity apart from spoken or sung performances they seem to me based upon the "personal autonomy" rather than the "free speech" line of cases. See note 2, supra
 
 
 [11]
 The statute in Stromberg forbade the flying of "a red flag, banner or badge ... as a sign, symbol or emblem of opposition to organized government ...." 283 U.S. at 361, 51 S.Ct. at 532
 
 
 [12]
 "The statute was deliberately and purposefully applied solely to terminate the reasonable, orderly, and limited exercise of the right to protest the unconstitutional segregation of a public facility." 383 U.S. at 142, 86 S.Ct. at 724
 
 
 [13]
 "The school officials banned and sought to punish petitioners for a silent, passive expression of opinion unaccompanied by any disorder or disturbance on the part of petitioners." 393 U.S. at 508, 89 S.Ct. at 737
 
 
 [14]
 "If [Washington's interest in preserving the national flag as an unalloyed symbol of our country] is valid, we note that it is directly related to expression in the context of activity like that undertaken by appellant. For that reason and because no other governmental interest unrelated to expression has been advanced or can be supported on this record, the four-step analysis of United States v. O'Brien ... is inapplicable." 418 U.S. at 414 n. 8, 94 S.Ct. at 2732 n. 8 (citation omitted)
 
 
 [15]
 "[B]oth the governmental interest and the operation of the 1965 Amendment [banning draft card burning] are limited to the noncommunicative aspect of O'Brien's conduct." 391 U.S. at 381-82, 88 S.Ct. at 1681-1682
 
 
 [16]
 "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity." 391 U.S. at 376, 88 S.Ct. at 1678
 
 
 [17]
 See the cases cited at 391 U.S. at 376-77 nn. 22-27, 88 S.Ct. at 1678-1679 nn. 22-27
 
 
 [18]
 See note 14, supra
 
 
 [19]
 See Vietnam Veterans Against the War v. Morton, 506 F.2d 53 (D.C.Cir.1974) (per curiam)
 
 
 [20]
 See Reply to Appellees' Opposition to Appellants' Emergency Motion for Injunction Pending Appeal and Opposition to Appellants' Motion for Summary Affirmance at 46 (Dec. 14, 1982) (description of Vietnam Veterans' May 1982 demonstration)